# The Department of Justice Inspector General's Access to Information Protected by the Federal Wiretap Act, Rule 6(e) of the Federal Rules of Criminal Procedure, and Section 626 of the Fair Credit Reporting Act

Department of Justice officials may disclose information protected by the Federal Wiretap Act (Title III of the Omnibus Crime Control and Safe Streets Act of 1968), Rule 6(e) of the Federal Rules of Criminal Procedure, and section 626 of the Fair Credit Reporting Act to the Department's Office of Inspector General ("OIG") in connection with many, but not all, of OIG's investigations and reviews.

Section 6(a)(1) of the Inspector General Act of 1978 does not supersede the limitations on disclosure contained in Title III, Rule 6(e), and section 626.

Section 218 of the Consolidated and Further Continuing Appropriations Act, 2015, also does not supersede the limitations on disclosure contained in Title III, Rule 6(e), and section 626.

July 20, 2015

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL[*]

You have asked whether the Department of Justice (the "Department") may lawfully provide the Department's Office of the Inspector General ("OIG") with access to documents containing certain kinds of statutorily protected information.[1] In particular, you have asked whether the Department may grant OIG access, in connection with OIG audits, investigations, and reviews, to information protected by the Federal Wiretap Act, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–2522 ("Title III"); Rule 6(e) of the Federal Rules of Criminal Procedure ("Rule 6(e)"); and section 626 of the Fair Credit Reporting Act, 15 U.S.C. § 1681u ("FCRA"). Subject to certain exceptions,

---

[*] Editor's Note: Since this opinion was issued, Congress amended section 6(a) of the Inspector General Act to provide that inspectors general are authorized "to have timely access to all records, reports, audits, reviews, documents, papers, recommendations, or other materials available to the applicable establishment which relate to the programs and operations with respect to which that Inspector General ha responsibilities under this Act . . . notwithstanding any other provision of law, except pursuant to any provision of law enacted by Congress that expressly . . . refers to the Inspector General; and . . . limits the right of access of the Inspector General." Inspector General Empowerment Act of 2016, Pub. L. No. 114-317, sec. 5(1), § 6(a)(1)(A), (B) (codified at 5 U.S.C. app. § 6(a)(1)(A), (B)). The amended statute also provides a special procedure for access to "Federal grand jury materials protected from disclosure pursuant to rule 6(e) of the Federal Rules of Criminal Procedure." *Id.* § 6(a)(1)(C)). We analyzed inspector general access under statutory provisions similar to those in the amended section 6(a) in *Authority of the Department of Justice to Disclose Statutorily Protected Materials to Its Inspector General in Light of Section 540 of the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2016*, 40 Op. O.L.C. __ (Apr. 27, 2016), http://www.justice.gov/olc/opinions.htm.

[1] *See* Memorandum for Karl Thompson, Acting Assistant Attorney General, Office of Legal Counsel, from James M. Cole, Deputy Attorney General (May 24, 2014) ("Opinion Request"). Our Office received a request for an opinion on the same subject in 2011, but that request was withdrawn. *See* Letter for Cynthia Schnedar, Acting Inspector General, from James M. Cole, Deputy Attorney General (Mar. 16, 2012). In preparing this opinion, we have considered views submitted in connection with both requests.

each of these statutes restricts the disclosure of particular categories of information: Title III limits the Department's authority to disclose the contents of intercepted communications; Rule 6(e) limits the Department's authority to disclose grand jury materials; and section 626 of FCRA limits the authority of the Federal Bureau of Investigation ("FBI") to disclose consumer information obtained pursuant to National Security Letters issued under section 626. At the same time, however, section 6(a)(1) of the Inspector General Act of 1978, as amended, 5 U.S.C. app. (the "IG Act"), authorizes OIG "to have access to all records, reports, audits, reviews, documents, papers, recommendations, or other material" available to the Department and relevant to the programs and operations OIG is charged with reviewing. 5 U.S.C. app. § 6(a)(1).

In views letters submitted in connection with the preparation of this opinion, OIG, together with certain other interested entities, argues that section 6(a)(1) of the IG Act grants it an unqualified right of access to Department records relevant to its audits, investigations, and reviews, notwithstanding any limitations on disclosure imposed by Title III, Rule 6(e), or section 626 of FCRA. OIG also argues that, even leaving section 6(a)(1) aside, the relevant statutory exceptions in Title III, Rule 6(e), and section 626 permit the Department and its components to disclose protected information to OIG when that information is pertinent to its audits, investigations, or reviews. Certain other Department components disagree, arguing that the statutory exceptions in Title III, Rule 6(e), and section 626 permit disclosure of protected information to OIG only in a limited set of circumstances, and that the limits on disclosure apply even when OIG requests material under section 6(a)(1) of the IG Act.[2]

---

[2] *See* E-mail for John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from William M. Blier, General Counsel, OIG (Apr. 29, 2015 6:37 PM) ("OIG 2015 E-mail"); Memorandum for the Acting Assistant Attorney General, Office of Legal Counsel, from Michael E. Horowitz, Inspector General (June 24, 2014) ("OIG 2014 Memorandum"); Memorandum for the Attorney General from Cynthia A. Schnedar, Acting Inspector General (Dec. 16, 2011) ("OIG Grand Jury Memorandum"); Memorandum for the Deputy Attorney General from Cynthia A. Schnedar, Acting Inspector General (Dec. 16, 2011) ("OIG Title III Memorandum"); Memorandum for the Deputy Attorney General from Cynthia A. Schnedar, Acting Inspector General (Dec. 6, 2011) ("OIG FCRA Memorandum"); Memorandum for Caroline D. Krass, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Carol F. Ochoa, Assistant Inspector General, Oversight and Review Division (Mar. 9, 2011) ("OIG Supplemental Memorandum"); Memorandum for Paul P. Colborn, Special Counsel, Office of Legal Counsel, from Carol F. Ochoa, Assistant Inspector General, Oversight and Review Division (Dec. 17, 2010) ("OIG Memorandum"); *see also* Memorandum for John Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from Leslie R. Caldwell, Assistant Attorney General, Criminal Division (July 14, 2014); Letter for John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from Phyllis K. Fong, Chair, and Lynne A. McFarland, Vice Chair, Council of the Inspectors General on Integrity and Efficiency ("CIGIE") (June 24, 2014); Memorandum for John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from G. Bradley Weinsheimer, Deputy Counsel, Office of Professional Responsibility (June 24, 2014); E-mail for John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from Jocelyn Aqua, National Security Division (Mar. 2, 2012 3:54 PM) ("NSD E-mail"); Memorandum for Virginia A. Seitz, Assistant Attorney General, Office of

For the reasons set forth below, we conclude that the statutory exceptions in Title III, Rule 6(e), and section 626 of FCRA permit the Department to disclose to OIG the covered information it seeks in most, but not all, of the circumstances in which OIG might request it. In particular, Title III permits Department officials to disclose to OIG the contents of intercepted communications when doing so could aid the disclosing official or OIG in the performance of their duties related to law enforcement, including duties related to Department leadership's supervision of law enforcement activities on a programmatic or policy basis. Rule 6(e) permits disclosure of grand jury materials to OIG if a qualifying attorney determines that such disclosure could assist her in the performance of her criminal law enforcement duties, including any supervisory law enforcement duties she may have. And FCRA permits the FBI to disclose to OIG consumer information obtained pursuant to section 626 if such disclosure could assist in the approval or conduct of foreign counterintelligence investigations, including in the supervision of such investigations on a programmatic or policy basis. In our view, however, Title III and Rule 6(e) forbid disclosures that have either an attenuated or no connection with the conduct of the Department's criminal law enforcement programs or operations, and section 626 of FCRA forbids disclosures that have either an attenuated or no connection with the approval or conduct of foreign counterintelligence investigations.

We further conclude that, to the extent that Title III, Rule 6(e), and section 626 prohibit Department officials from disclosing information to OIG, section 6(a)(1) of the IG Act does not override these prohibitions. Under longstanding interpretive principles, general access provisions like section 6(a)(1) are generally construed not to override specific, carefully drawn limitations on disclosure like Title III, Rule 6(e), and section 626 unless Congress has clearly indicated that it intends the general access provision to have that effect. And in our view, the text of the IG Act contains no clear indication that Congress intended section 6(a)(1) to override Title III, Rule 6(e), or section 626. The Act's legislative history, moreover,

---

Legal Counsel, from Lanny A. Breuer, Assistant Attorney General, Criminal Division (Feb. 16, 2012); Letter for John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from Phyllis K. Fong, Chair, and Carl Clinefelter, Vice Chair, CIGIE (Oct. 7, 2011); Memorandum for the Office of the Deputy Attorney General, from Patrick W. Kelley, Acting General Counsel, FBI (Oct. 5, 2011); Memorandum for John Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from Lanny A. Breuer, Assistant Attorney General, Criminal Division (Apr. 12, 2011); Memorandum for Jonathan G. Cedarbaum, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Valerie Caproni, General Counsel, FBI (Jan. 13, 2011) ("FBI Memorandum").

In addition, although the Office does not solicit views from outside the Executive Branch, we received a letter concerning the issues addressed in this opinion from Senator Charles E. Grassley and Representative John Conyers, then-Ranking Members of the Senate and House Committees on the Judiciary. *See* Letter for Karl R. Thompson, Acting Assistant Attorney General, Office of Legal Counsel, from Charles E. Grassley, Ranking Member, Committee on the Judiciary, U.S. Senate, and John Conyers, Ranking Member, Committee on the Judiciary, U.S. House of Representatives (Oct. 10, 2014). We appreciate Senator Grassley's and Representative Conyers' interest in these issues, and have considered their views in preparing this opinion.

affirmatively indicates that Congress expected an inspector general's right of access to be subject to statutory limits on disclosure.

In reaching these conclusions, our Office's role has not been to decide what access OIG should receive as a matter of policy. Rather, we have endeavored to determine as a matter of law, using established tools of statutory construction, how best to reconcile the strong privacy protections embodied in Title III, Rule 6(e), and section 626 with the interest in access reflected in section 6(a)(1) of the IG Act.

This opinion has four parts. In Part I, we set forth some statutory background related to the IG Act, and explain the potential statutory conflict that arises when OIG, relying on the IG Act's general access provision, requests material that is also covered by the nondisclosure provisions in Title III, Rule 6(e), or section 626 of FCRA. In Part II, we examine Title III, Rule 6(e), and section 626 to determine whether the exceptions in those statutes permit disclosure of the protected materials OIG seeks, thereby avoiding the potential conflict between those statutes and the IG Act. In Part III, having concluded that this conflict cannot be avoided in all circumstances, we explain why, in our view, the general access provision in section 6(a)(1) of the IG Act does not override the specific protections of sensitive information contained in Title III, Rule 6(e), and section 626. Finally, in Part IV, we discuss a Fiscal Year 2015 appropriations rider concerning the disclosure of Department materials to OIG and conclude that it too does not abrogate the specific protections of sensitive information found in those statutes.[3]

## I.

Congress enacted the IG Act in 1978 to "create independent and objective units" within the Executive Branch that would promote the integrity of executive agencies and keep executive officials and Congress fully informed about their operations. 5 U.S.C. app. § 2. To achieve these goals, the Act created an Office of Inspector General in a large number of federal agencies. *Id.* §§ 2(A), 8G(a)–(b), 12(2).[4] Each office is led by an inspector general who is charged with auditing, investigating, detecting fraud and abuse in, and making recommendations and reports about the agency's "programs and operations." *Id.* §§ 3(a), 4(a), 5. Each inspector general must "keep the head of [his agency] and the Congress fully and currently informed"

---

[3] You have asked only whether it would be "lawful[]" for the Department to provide OIG information protected by Title III, Rule 6(e), and section 626 of FCRA. Opinion Request. Accordingly, we do not address in this opinion whether and, if so, under what circumstances the Department could lawfully withhold information it is legally permitted to disclose.

[4] The IG Act uses the term "establishment" to refer to those enumerated agencies, departments, commissions, boards, and corporations in which Congress created an Office of the Inspector General. 5 U.S.C. app. § 12(2). The Act also refers to "designated Federal entit[ies]," defined to include a different list of government corporations and other entities, and directs that "there shall be established and maintained in each designated Federal entity an Office of Inspector General." *Id.* § 8G(b). Throughout this opinion, we will refer to the federal establishments and entities subject to the IG Act, collectively, as "agencies."

about fraud, abuse, deficiencies, and other serious problems in "the administration of programs and operations administered or financed by such" agency, and "recommend corrective action" to address any problems he identifies. *Id.* § 4(a)(5). Inspectors general must "report to" and are placed "under the general supervision of" the heads of their agencies. However, the head of an agency generally may not "prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation." *Id.* § 3(a).

Pursuant to their statutory mandate, inspectors general engage in a wide variety of audits, investigations, and reviews. The Department's OIG, for example, conducts investigations of suspected criminal wrongdoing by Department employees; investigations of administrative misconduct that may or may not rise to the level of criminal wrongdoing; and broader reviews of Department programs and operations that seek to assess whether the programs are lawful, well-run, or otherwise in the public interest. *See* Office of the Inspector General, U.S. Dep't of Justice, *Semiannual Report to Congress: Apr. 1, 2014–Sept. 30, 2014*, at 13–14 (Oct. 31, 2014) ("*Semiannual Report*"); 28 C.F.R. § 0.29a(b)(2), (4). The Department's OIG also conducts financial and administrative audits of Department components. *See Semiannual Report* at 13; 28 C.F.R. § 0.29a(b)(1). Significantly, however, while the IG Act affords inspectors general broad authority to investigate an agency's programs and operations, it does not in most cases allow inspectors general to conduct activities "constituting an integral part of the programs involved," *Inspector General Authority to Conduct Regulatory Investigations*, 13 Op. O.L.C. 54, 62 (1989) ("*Authority to Conduct Regulatory Investigations*"), and it prohibits the heads of federal agencies from transferring to inspectors general any of the agency's "program operating responsibilities," 5 U.S.C. app. § 9(a).[5]

The IG Act also grants inspectors general several enumerated authorities that help them carry out their statutory duties, such as the authority to issue subpoenas, take sworn testimony, and hire staff. *See id.* § 6(a)(4), (5), (7). Especially relevant here is the authority to obtain records and other materials from the agency over which an inspector general has investigative jurisdiction. This authority is set forth in section 6(a)(1), which provides:

> [E]ach Inspector General, in carrying out the provisions of this Act, is authorized . . . to have access to all records, reports, audits, reviews, documents, papers, recommendations, or other material available to the applicable [agency] which relate to programs and operations with

---

[5] Some of OIG's statutory responsibilities, such as conducting investigations of suspected criminal wrongdoing by Department employees, *see* 5 U.S.C. app. § 8E(b)(2), (4), may involve the same kinds of activities as the "program operating responsibilities" of other Department components. The IG Act does not prevent OIG from carrying out these activities pursuant to its statutory authority. *See Authority to Conduct Regulatory Investigations*, 13 Op. O.L.C. at 66–67 & n.21.

respect to which that Inspector General has responsibilities under this
Act.

*Id*. § 6(a)(1). In addition to granting each inspector general access to materials available to his agency and within his investigative jurisdiction, this provision implicitly imposes a corresponding duty on the applicable agency to provide the inspector general with such access upon request.

In the case of the Department (and certain other agencies), however, the IG Act qualifies this broad disclosure requirement. As originally enacted, the IG Act did not establish an Office of the Inspector General in the Justice Department. When Congress extended the Act's provisions to the Department in 1988, *see* Inspector General Act Amendments of 1988, Pub. L. No. 100-504, § 102(c), 102 Stat. 2515, 2515–16, Congress limited OIG's authority to investigate matters involving certain kinds of information, in recognition of the sensitivity of much of the Department's work, *see* H.R. Rep. No. 100-1020, at 24 (1988) (Conf. Rep.). Specifically, section 8E(a)(1) of the Act provides that the Department's Inspector General "shall be under the authority, direction, and control of the Attorney General with respect to audits or investigations, or the issuance of subpenas, which require access to sensitive information concerning" certain enumerated matters, such as "ongoing civil or criminal investigations or proceedings," "undercover operations," and "other matters the disclosure of which would constitute a serious threat to national security." 5 U.S.C. app. § 8E(a)(1). Section 8E(a)(2) similarly provides that the Attorney General may "prohibit the Inspector General from carrying out or completing any audit or investigation . . . if the Attorney General determines that such prohibition is necessary to prevent the disclosure of any information described under [section 8E(a)(1)] or to prevent the significant impairment to the national interests of the United States." *Id.* § 8E(a)(2). Section 8E thus provides a mechanism through which the Attorney General can "prevent the disclosure" of certain sensitive information to which OIG would otherwise be entitled under section 6(a)(1). *Id.*

The IG Act, moreover, is not in all circumstances the only statute that governs OIG's access to Department materials. As noted above, in conducting its audits, investigations, and reviews, OIG has sometimes requested materials that include the contents of wire, oral, or electronic communications the Department has intercepted pursuant to Title III; information the Department has acquired in the course of grand jury proceedings; and consumer information the FBI has obtained using National Security Letters issued under section 626 of FCRA. And while such information falls within the broad terms of section 6(a)(1) of the IG Act, its use and disclosure is also regulated, and in many circumstances prohibited, by Title III, Rule 6(e), and section 626.[6] Specifically, as we discuss in more detail

---

[6] Because Congress enacted Rule 6(e) in 1977, *see* Pub. L. No. 95-78, § 2, 91 Stat. 319, 319, it is "by any definition . . . a statute." *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d

below, Title III bars investigative and law enforcement officers from using or disclosing the contents of lawfully intercepted communications unless a statutory exception to Title III's disclosure prohibitions applies, *see* 18 U.S.C. § 2517, and imposes administrative, civil, and sometimes criminal sanctions for unauthorized disclosure, *see id.* §§ 2520(a), (f), (g), 2511(1)(e), (4)(a). Rule 6(e) prohibits "attorney[s] for the government" and other specified individuals from disclosing "a matter occurring before the grand jury" except pursuant to a specific exception, Fed. R. Crim. P. 6(e)(2)(B), and makes a knowing violation of that prohibition punishable "as a contempt of court," *id.* 6(e)(7). And section 626 of FCRA prohibits the FBI from disclosing consumer information obtained pursuant to a National Security Letter (a kind of written request for information in connection with a counterterrorism or intelligence investigation) except as authorized by one of the exceptions provided in the statute, *see* 15 U.S.C. § 1681u(f), and makes unauthorized disclosure a basis for civil damages and disciplinary action, *see id.* § 1681u(i)–(j).

As a result, in responding to OIG requests for materials covered by Title III, Rule 6(e), or section 626, Department officials face potentially conflicting statutory directives. Title III, Rule 6(e), and section 626 prohibit the Department from disclosing such materials—on pain of contempt, administrative and civil sanctions, and sometimes criminal penalties—unless a statutory exception applies. The IG Act, in contrast, requires the Department to disclose "all" materials that are available to the Department, relate to an OIG review of programs or operations within its investigative jurisdiction, and are not covered by a determination to withhold them under section 8E.

Where two statutes govern the same subject matter, the Supreme Court has instructed that the statutes are to be read *in pari materia* and construed, where possible, as part of a single and coherent regulatory scheme. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("When there are two acts upon the same subject, the rule is to give effect to both if possible." (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939))); *see also, e.g.*, *FCC v. NextWave Personal Commc'ns*, 537 U.S. 293, 304 (2003); *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984). Only where a harmonious construction of two statutes is impossible should one be construed as overriding or implicitly repealing the other. *Morton*, 417 U.S. at 551. Accordingly, before considering whether the general access requirement in section 6(a)(1) of the IG Act overrides the disclosure restrictions in Title III, Rule 6(e), and section 626 of FCRA, we examine the latter three statutes to determine whether and to what extent they permit disclosures to OIG.

---

856, 867 (D.C. Cir. 1981) (concluding that grand jury information protected from disclosure by Rule 6(e) is information "specifically exempted from disclosure by statute" within the meaning of Exemption 3 of the Freedom of Information Act, 5 U.S.C. § 552(b)(3)).

## II.

## A.

We begin with Title III. Congress enacted this statute in the wake of the Supreme Court's decisions in *Berger v. New York*, 388 U.S. 41 (1967), and *Katz v. United States*, 389 U.S. 347 (1967), which held that electronic surveillance constitutes a search subject to the limits imposed by the Fourth Amendment. In response to these rulings, Congress created a comprehensive statutory scheme governing the interception, use, and disclosure of wire, oral, and electronic communications, *see* 18 U.S.C. §§ 2510–2522, thereby establishing a mechanism through which law enforcement officials could conduct electronic surveillance in a manner that "me[t] the constitutional requirements" enunciated in *Berger* and *Katz. United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 302 (1972); *see Scott v. United States*, 436 U.S. 128, 130 (1978) (noting that Title III was intended to "provide law enforcement officials with some of the tools thought necessary to combat crime without unnecessarily infringing upon the right of individual privacy"). Title III permits the Attorney General and other Department leadership officials to authorize investigative or law enforcement officers to apply for court orders allowing them to intercept wire, oral, or electronic communications. *See* 18 U.S.C. §§ 2510, 2516(1), (3), 2518(1)(a); *see also id.* § 2516(2) (authorizing applications by certain state attorneys). And it permits courts to grant such orders if the government makes a series of procedural and evidentiary showings, including a showing that the interception "may provide or has provided" evidence of any of dozens of enumerated federal offenses (or, for the interception of an electronic communication, evidence of "any Federal felony"). *Id.* §§ 2516(1), (3), 2518.

Once an investigative or law enforcement officer has lawfully intercepted a communication, Title III prohibits that officer from further disclosing the contents of the communication—and, as noted above, subjects her to potential administrative, civil, or criminal sanctions if she does so—unless section 2517 authorizes the disclosure. *See Title III Electronic Surveillance Material and the Intelligence Community*, 24 Op. O.L.C. 261, 270–71 n.12, 272 (2000) ("*Title III Intelligence Community*"); 18 U.S.C. § 2520(a), (f), (g) (authorizing civil damages and administrative discipline for willful disclosures); *id.* § 2511(1)(e), (4)(a) (authorizing criminal penalties for certain intentional disclosures). One provision in section 2517, section 2517(1), is particularly relevant here. It provides that

> [a]ny investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

18 U.S.C. § 2517(1). This provision thus permits disclosure of the contents of a lawfully intercepted communication if the disclosure is made (1) by an "investigative or law enforcement officer," (2) "to another investigative or law enforcement officer," (3) "to [an] extent . . . appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." A separate provision in Title III, section 2510(7), defines an "[i]nvestigative or law enforcement officer" as "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses." *Id.* § 2510(7).

OIG contends that section 2517(1) authorizes Department investigative and law enforcement officers to disclose the contents of lawfully intercepted communications to OIG whenever OIG deems such information pertinent to any of its investigations. It observes that, in a prior opinion, this Office "determined that OIG agents . . . qualify as 'investigative officers' authorized to disclose or receive Title III information." OIG 2014 Memorandum at 11 (citing *Whether Agents of the Department of Justice Office of Inspector General are "Investigative or Law Enforcement Officers" Within the Meaning of 18 U.S.C. § 2510(7)*, 14 Op. O.L.C. 107, 109–10 (1990) ("*Investigative Officers*")). And OIG contends that disclosures to assist in its audits, investigations, and reviews are invariably "appropriate to the proper performance of the official duties of the officer making or receiving the disclosure" for two different (and in its view independently sufficient) reasons. First, it argues that under an ordinary understanding of the term "official duties," disclosing Title III materials to OIG will always be appropriate to both the official duties of the Department officials disclosing the materials (because those officials have a duty to cooperate with OIG's audits, investigations, and reviews) and the official duties of the OIG agents receiving the materials (because the IG Act gives them a duty to investigate the Department). Second, OIG argues that even if "official duties" are limited to duties related to law enforcement—as this Office concluded in a 2000 opinion—all of OIG's audits, investigations, and reviews still qualify for disclosure, because they involve either investigations of alleged criminal wrongdoing by Department employees, investigations of alleged administrative misconduct that might lead to discovery of criminal violations, or reviews of the Department's criminal law enforcement programs for purposes of "supervision or oversight." OIG Title III Memorandum at 2; *see* OIG 2014 Memorandum at 10–12; *cf.* OIG Supplemental Memorandum at 35–38.

We address these arguments in the two sections that follow. In the first section, we conclude that OIG is correct that OIG agents qualify as "investigative officers" who may receive Title III information, but—consistent with the conclusion in our 2000 opinion—disagree with OIG's broad argument that Title III permits disclosure in connection with duties unrelated to law enforcement. In the second section, we substantially agree with OIG's narrower argument—namely, that disclosures to OIG agents will frequently assist the official law-enforcement-related duties of

either the officer making or the officer receiving the disclosure. In particular, we conclude that Title III permits disclosure in connection with OIG reviews that concern, or are designed to develop recommendations about, the conduct of the Department's criminal law enforcement programs, policies, or practices. As we explain, many—but not all—OIG investigations and reviews are likely to qualify for disclosure under this standard.

## 1.

OIG's first argument is that section 2517(1) invariably permits Department officials to disclose Title III information to OIG agents. *See* OIG 2014 Memorandum at 10–12. We agree that disclosures between Department officials and OIG agents generally comply with the statute's first two requirements: Numerous officers of the Department are "investigative or law enforcement officer[s]" entitled to disclose Title III information under section 2517(1), and OIG agents are "investigative or law enforcement officer[s]" entitled to receive such information. But, as we explain below, a prior opinion of this Office concluded that the statutory phrase "official duties" refers only to official duties related to law enforcement. That conclusion applies here, and means that disclosing information to OIG is not in itself, and without some further link to law enforcement, "appropriate to the proper performance of [an] official dut[y]" within the meaning of section 2517(1).

The first requirement for a disclosure under section 2517(1) is that it be made by an "investigative or law enforcement officer," defined as an officer of the United States (or a State or locality) empowered to "conduct investigations of," "make arrests for," or, if the officer is an attorney, "prosecute or participate in the prosecution of" offenses enumerated in section 2516. 18 U.S.C. § 2510(7). Numerous officials in the Department qualify as "investigative or law enforcement officer[s]" who may disclose intercepted communications under this provision. The officers who typically possess Title III information, such as FBI agents, qualify as investigative or law enforcement officers by virtue of their authority to "investigat[e]" and "make arrests for" crimes enumerated in section 2516. *Id.*; *see, e.g.*, 28 C.F.R. § 0.85 (enumerating investigatory functions of the FBI). And prosecutors, such as Assistant United States Attorneys, qualify because they are federal officers "authorized by law to prosecute or participate in the prosecution of" enumerated offenses. 18 U.S.C. § 2510(7); *see, e.g.*, 28 U.S.C. §§ 542, 547 (authorizing United States Attorneys and their assistants to prosecute federal offenses). Officers of the Department with leadership or supervisory responsibilities, such as the Attorney General and Deputy Attorney General, also qualify as investigative or law enforcement officers. They too are executive officers generally vested with authority to investigate, make arrests for, and prosecute offenses enumerated in section 2516. *See, e.g.*, 28 U.S.C. §§ 509, 515; 28 C.F.R. § 0.15(a). In addition, as we explain below, these officers participate in investigations, arrests, and

prosecutions through their direction and supervision of those actions on an individual or programmatic basis. *See infra* pp. 14–15.

Section 2517(1)'s second requirement is that the person receiving a disclosure of Title III material also be an investigative or law enforcement officer. As OIG observes, this Office has already concluded, in a 1990 opinion, that OIG agents "qualify as 'investigative officer[s]' under section 2510(7)." *Investigative Officers*, 14 Op. O.L.C. at 109 (alteration in original). OIG agents, as officers in the Executive Branch, are "officer[s] of the United States." 18 U.S.C. § 2510(7). Further, as we explained in our 1990 opinion, the IG Act "entrusts [OIG] with investigative, auditing, and other responsibilities relevant to the detection and prosecution of fraud and abuse within [Department] programs or operations." 14 Op. O.L.C. at 109–10. When OIG agents, exercising those responsibilities, "discover evidence that . . . Department personnel, contractors, or grantees are engaging in [offenses enumerated in section 2516]"—such as "bribery of public officials and witnesses," "influencing or injuring an officer, juror, or witness," or "obstruction of criminal investigations"—they have the authority to investigate those crimes. *Id.* at 110. Indeed, the portion of the IG Act that created OIG specifically authorizes it to "investigate allegations of criminal wrongdoing" by Department employees. 5 U.S.C. app. § 8E(b)(2), (4); *see also id.* § 8E(d); 28 C.F.R. §§ 0.29a(b)(2), 0.29c(a). Furthermore, upon learning of "reasonable grounds to believe there has been a violation of Federal criminal law," inspectors general are required to "report [such violations] expeditiously to the Attorney General," *Investigative Officers*, 14 Op. O.L.C. at 109 (quoting 5 U.S.C. app. § 4(d)), presumably so that the Attorney General can consider the matter for prosecution. OIG's investigative jurisdiction thus "carries with it the power to investigate offenses enumerated in section 2516," and as a result, OIG agents—"including special agents, auditors and investigators"—are "investigative officers" entitled to receive disclosures of Title III information under section 2517(1). *Id.* at 110.[7]

The conclusion that both Department officials who maintain Title III information and OIG agents who seek it are "investigative or law enforcement officer[s]" under section 2517(1), however, does not mean that those officers may share Title III information with each other in all circumstances. Section 2517(1)'s third requirement is that any disclosure of Title III information between qualifying officers must be "appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." 18 U.S.C. § 2517(1). In our 2000 *Title III Intelligence Community* opinion, this Office concluded that the phrase "official duties," despite its apparent breadth, includes only the "*law enforcement* duties" of the relevant officer—that is, those "duties related to the prevention, investigation, or prosecution of criminal conduct." 24 Op. O.L.C. at 264 n.7, 265 (emphasis in original). We reasoned that if "official duties" were read to "permit

---

[7] Some OIG agents may also qualify as "investigative or law enforcement officer[s]" because they are authorized by the Attorney General, pursuant to specific provisions in the IG Act, to make warrantless arrests and execute arrest warrants. *See* 5 U.S.C. app. § 6(e); 28 C.F.R. § 0.29j(d)–(e).

disclosure . . . for purposes unrelated to law enforcement," section 2517(1) "would constitute only a highly elastic limitation on disclosure among law enforcement officers"—allowing, for instance, an attorney with both civil and criminal duties to receive wiretap information for use in civil litigation. *Id*. at 265. We found this result "unlikely in light of Congress's effort in Title III to protect privacy to the maximum extent possible, consistent with permitting electronic surveillance for law enforcement purposes." *Id.*; *see id.* at 267–69 (discussing the statute's purpose). We also noted that Title III's legislative history demonstrated that "Congress sought in § 2517 to serve 'criminal law investigation and enforcement objectives,'" *id.* at 265 (quoting *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 73 (D.C. Cir. 1983)), and observed, based on a survey of judicial decisions applying section 2517, that "the uses of Title III information permitted by courts have all related to law enforcement," *id.* at 266. We therefore concluded that "the phrase 'appropriate to the proper performance of . . . official duties'" in section 2517 "authorizes disclosure of Title III material only for purposes related to law enforcement." *Id.* at 265, 267.

OIG argues that this conclusion does not apply to disclosures made to OIG in connection with its investigations. It points out that our *Title III Intelligence Community* opinion concerned disclosures of Title III information to members of the intelligence community, who we concluded were *not* "investigative or law enforcement officer[s]" within the meaning of sections 2510(7) and 2517. *See* OIG 2014 Memorandum at 11. As a result, our conclusion there—that Title III information could be disclosed to members of the intelligence community in certain circumstances—was based not on section 2517(1), but on section 2517(2), a different exception that permits investigative or law enforcement officers to "use" Title III information, including by disclosing it, "to the extent such use is appropriate to the proper performance of [the] official duties" of the disclosing officer. 18 U.S.C. § 2517(2). As OIG observes, its agents are investigative or law enforcement officers, and thus, unlike members of the intelligence community, may in principle receive disclosures on the basis of their *own* "official duties" under section 2517(1), rather than the duties of the disclosing officer. OIG argues that, as a result, the conclusions in *Title III Intelligence Community* should not control the scope of the disclosures it may receive. *See* OIG 2014 Memorandum at 11.

We disagree. Both sections 2517(1) and 2517(2) use the phrase "official duties," and as we explained in *Title III Intelligence Community*, "under basic canons of statutory construction," these "identical phrase[s] . . . must be interpreted consistently" each time they appear in the same statute. 24 Op. O.L.C. at 265 (citing *Sullivan v. Stroop*, 496 U.S. 478, 484–85 (1990); *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988)). Indeed, the *Title III Intelligence Community* opinion expressly analyzed section 2517(1) to determine how best to interpret "official duties" for purposes of section 2517(2), and concluded, in the discussion summarized above, that the phrase was best read in *both* sections as limited to a relevant official's law enforcement duties. *See id.* Nor is there any basis

for understanding the "official duties" of a receiving officer in section 2517(1) to have a broader scope than those of a disclosing officer in the same section, since the same phrase applies equally to both kinds of officers. *See* 18 U.S.C. § 2517(1) (requiring that disclosure assist "the official duties of the officer *making or receiving* the disclosure" (emphasis added)). The interpretation of "official duties" in *Title III Intelligence Community* thus extends to section 2517(1), and applies to the duties of both receiving and disclosing officers.

For this reason, we disagree with OIG's contention that "providing documents to . . . OIG in the context of [any] duly authorized review would typically be 'appropriate to the proper performance of the official duties of the official making . . . the disclosure'" solely because of "that official's duty to cooperate fully with . . . OIG's investigations and reviews." OIG 2014 Memorandum at 11. The duty to cooperate with OIG's investigations is certainly an "official dut[y]" in the broadest sense of that term. But that duty does not invariably "relate to law enforcement." *Title III Intelligence Community*, 24 Op. O.L.C. at 270. Indeed, we explained in *Title III Intelligence Community* that neither an officer's "general duty to share [information] with another government entity," nor the duty to respond to a "proper request or demand by a congressional committee," automatically constitutes an "official dut[y]" within the meaning of section 2517(1). *Id.* at 264, 271. Similarly, OIG's duty (as the potential receiving officer) to audit, investigate, and review the Department's activities does not automatically justify Title III disclosure, because it too may not always relate to law enforcement. As a result, we do not believe Department investigative or law enforcement officers can disclose Title III information to OIG without regard to whether the disclosure would be appropriate to the proper performance of an official duty related to law enforcement.

**2.**

OIG's second argument is that even if (as we have concluded) "official duties" are limited to duties related to law enforcement, OIG's audits, investigations, and reviews still qualify for disclosure, because they involve investigations of alleged criminal wrongdoing or administrative (and potentially criminal) misconduct by Department employees, or reviews of the Department's criminal law enforcement programs for purposes of "supervision and oversight." OIG Title III Memorandum at 2. For the reasons set forth below, we agree that many—but not all—of OIG's investigations and reviews are sufficiently related to law enforcement to support disclosure based on either the official duties of the officer making the disclosure, or the official duties of the officer receiving it.

We begin with those disclosures appropriate to the official duties of the officer "making . . . the disclosure." 18 U.S.C. § 2517(1). As explained above, numerous officers within the Department qualify as "investigative or law enforcement officer[s]" under section 2510(7). Their "official duties" related to law enforcement— and, thus, the functions in connection with which they may disclose Title III

information—vary according to their roles. Line-level officials, such as FBI agents and Assistant U.S. Attorneys, perform duties related to law enforcement through on-the-ground activities, such as investigating, making arrests for, and prosecuting crimes. *See id.* § 2510(7). Higher-ranking Department officials perform duties related to law enforcement when they direct and supervise those activities, such as by approving search warrant and wiretap applications, managing criminal investigations, and setting trial strategy—all functions that are integral parts of the prevention, investigation, and prosecution of criminal offenses. *See, e.g.*, *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 429 n.11 (1983) (recognizing that a prosecutor "conduct[s] criminal matters" in his role as a "supervisor" as well as by appearing before a grand jury); 18 U.S.C. § 2510(7) (stating that any attorney who is authorized to "participate in the prosecution" of an enumerated offense is an investigative or law enforcement officer). These officials may therefore disclose Title III information to OIG agents to the extent that doing so would be appropriate to the proper performance of these various functions, including "for the purpose of obtaining assistance" in carrying them out. *Title III Intelligence Community*, 24 Op. O.L.C. at 269; *see id.* at 261.[8]

In addition, in our view, members of Department leadership perform official duties related to law enforcement when they supervise law enforcement activities on a programmatic or policy basis—for example, when they issue guidelines for the exercise of prosecutorial discretion, or set rules governing the conduct of line-level officers. *See, e.g.*, Memorandum for Heads of Department of Justice Components and United States Attorneys from the Attorney General, *Re: Federal Prosecution Priorities* (Aug. 12, 2013) (listing factors that prosecutors should consider in setting prosecution priorities); FBI, *Domestic Investigations and Operations Guide* (Oct. 15, 2011) (establishing policies for the conduct of the FBI's domestic investigations). Although these programmatic and policy decisions are somewhat removed from on-the-ground law enforcement activities, they frequently affect these activities just as directly as supervisory decisions made on a case-by-case basis: A Department policy prohibiting a particular law enforcement tactic or mandating certain charging decisions, for instance, can affect the conduct of a large number of investigations and prosecutions all at once. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 346 (2009) (stating that "supervisory prosecutors" are entitled to the same degree of prosecutorial immunity when formulating "*general* methods of supervision and training" as when taking "actions related to an individual trial," because both activities are "directly connected with the prosecutor's basic trial advocacy duties" (emphasis in original)). Such broad-based supervision thus "relate[s] to law enforcement" in the ordinary sense of that phrase. *Cf.*

---

[8] For example, if OIG investigated a Department employee for alleged criminal misconduct and then referred the matter for prosecution, the prosecutor might subsequently seek to consult with OIG about its investigation in the course of preparing or conducting the prosecution. During that consultation, the prosecutor could disclose Title III information to OIG if doing so would help the prosecutor prepare or conduct the prosecution.

*Disclosure of Grand Jury Material to the Intelligence Community*, 21 Op. O.L.C. 159, 171 (1997) ("*Rule 6(e) Intelligence Community*") (stating that the Attorney General's "duty to enforce federal criminal law" within the meaning of Fed. R. Crim. P. 6(e)(3)(A)(ii) includes the supervision of "a broad criminal law enforcement program").

Moreover, given the size of the Department, such programmatic and policy supervision is a primary means by which the Attorney General and other Department leadership officials evaluate and direct the Department's law enforcement activities, including its use of Title III authorities. If that supervision did not constitute an "official dut[y]" within the meaning of section 2517(1), then leadership officials would be unable to programmatically review the contents of wiretaps in order to ensure that officers were exercising their Title III authorities responsibly and lawfully, or to conduct general management and supervision of Department law enforcement activities that made use of Title III materials. We think it unlikely that Congress intended to handicap leadership officials in this way. Indeed, interpreting Title III to impair programmatic or policy supervision of the use of Title III authorities and materials would undermine Congress's goal of "protect[ing] privacy to the maximum extent possible, consistent with permitting electronic surveillance for law enforcement purposes." *Title III Intelligence Community*, 24 Op. O.L.C. at 265; c*f. United States v. Giordano*, 469 F.2d 522, 527 (4th Cir. 1972) (noting that "[b]ecause of the delicate nature of the power to initiate surveillance applications," Congress took care to ensure that "the implementation" of this authority "was reserved to" high-level leadership officials within the Department). These considerations reinforce our conclusion that supervising law enforcement activities on a programmatic or policy basis qualifies as an "official dut[y]" related to law enforcement within the meaning of section 2517(1).

A Department leadership official may therefore disclose Title III materials to OIG agents when doing so would be appropriate to the performance of that official's duty to supervise law enforcement activities on a programmatic or policy basis. And, while we will not attempt to specify in the abstract all situations in which such disclosures would be appropriate, we think that, in general, a wide range of OIG investigations and reviews would likely assist Department leadership officials in conducting such programmatic and policy supervision. One of the central purposes of OIG's reviews and investigations is to assist Department leadership in supervising the Department: As noted above, Congress enacted the IG Act in part to "provide a means for keeping the head of [each] [agency] . . . fully and currently informed about problems and deficiencies relating to the administration of [the agency's] programs and operations and the necessity for and progress of corrective action," 5 U.S.C. app. § 2(3), and it assigned OIG the statutory duty of providing reports and recommendations about such issues to Department leadership, *see id.* § 4(a)(5). Moreover, consistent with Congress's purpose, "OIG's reports of its investigations and reviews have historically provided the Attorney General and Deputy Attorney General with critical advice, information, and insights in

connection with the exercise of their supervisory responsibilities over the Department's programs and operations." Letter for Michael E. Horowitz, Inspector General, from Sally Quillian Yates, Acting Deputy Attorney General, at 2 (Apr. 23, 2015) ("Yates Letter"). We therefore believe that it would generally be "appropriate to the proper performance of the official duties" of a member of the Department's leadership to disclose Title III information to OIG agents in connection with investigations or reviews of law enforcement programs and operations that could inform supervisory decisions made by Department leadership about such programs and operations; that is, investigations or reviews that concern, or are designed to develop recommendations about, the manner in which the Department prevents, investigates, or prosecutes crimes.[9]

We now turn to disclosures that would be appropriate to the proper performance of the official duties of the officer "*receiving* the disclosure"—in this case, OIG agents. As noted above, this Office has previously concluded that OIG agents qualify as "investigative officer[s]" under section 2510(7) by virtue of their authority to investigate allegations of criminal wrongdoing—including offenses enumerated in section 2516—by Department employees, contractors, and grantees. *Investigative Officers*, 14 Op. O.L.C. at 109 (alteration in original). Because investigations of alleged criminal wrongdoing are plainly "official duties" related to law enforcement, section 2517(1) authorizes Department investigative and law enforcement officers to disclose Title III information to OIG agents as "appropriate to the proper perform-ance" of OIG's investigations of alleged criminal wrongdoing by Department employees, contractors, or grantees, including administrative misconduct investiga-tions that have a reasonable prospect of identifying criminal wrongdoing.

We further believe that OIG officials perform "official duties" related to law enforcement within the meaning of section 2517(1) when they conduct investigations and reviews that could help Department leadership officials make supervisory decisions regarding the Department's law enforcement programs, policies, and practices. As we have already noted, Congress placed OIG within the Department of Justice, the nation's principal law enforcement agency, *see* 5 U.S.C. app. §§ 2(A), 12(2); 28 U.S.C. §§ 501 *et seq*., and assigned it the "duty and responsibility" of reviewing the Department's programs and operations, including its programs and operations related to law enforcement, in order to help the Attorney

---

[9] For example, the initial request for this opinion was prompted by three recent OIG reviews: a review of Operation Fast and Furious (an investigation of firearms trafficking, conducted by the Department's Bureau of Alcohol, Tobacco, Firearms, and Explosives, that employed a controversial investigative technique); a review of the FBI's alleged misuse of the material witness statute, 18 U.S.C. § 3144, to detain persons suspected of criminal conduct rather than potential witnesses; and a review of the FBI's use of National Security and Exigent letters. All three of these investigations concerned operational questions related to the Department's prevention, investigation, or prosecution of criminal conduct, and all promised to directly inform Department leadership's supervision of these activities. Department leadership could therefore properly disclose Title III information to OIG in connection with all three investigations under section 2517(1).

General and her assistants better manage those programs and operations, 5 U.S.C. app. § 4(a). OIG agents thus have responsibilities that are closely related to Department leadership's duty to supervise and manage the Department's law enforcement functions on a programmatic and policy basis, and are therefore sufficiently related to law enforcement to constitute "official duties" under section 2517(1).

We recognize that, in at least two respects, OIG reviews of Department law enforcement operations have a more attenuated relationship to the actual conduct of those operations than policy and programmatic supervision conducted by Department leadership; but we do not think that either of these distinctions prevents the conduct of such reviews from constituting an "official dut[y]" under section 2517(1). First, OIG provides information and recommendations that may *inform* supervisory decisions made by Department leadership, but it does not—and cannot—actually *make* operational decisions concerning the Department's law enforcement activities. *See Authority to Conduct Regulatory Investigations*, 13 Op. O.L.C. at 62 (concluding that inspectors general may not conduct "investigations constituting an integral part of the programs involved"); 5 U.S.C. app. § 9(a) (prohibiting the Attorney General from transferring to OIG "program operating responsibilities"). Neither the statutory phrase "official duties," however, nor our prior conclusion that this phrase encompasses duties that "relate to law enforcement," *Title III Intelligence Community*, 24 Op. O.L.C. at 271, requires that such duties involve operational law enforcement responsibilities. Indeed, such a requirement would exclude activities that are essential to the effective conduct of core law enforcement functions. It is difficult to imagine how most law enforcement duties, including the duty to set relevant policy and conduct programmatic supervision, could be carried out responsibly without the benefit of the fact-finding and evaluative work necessary to inform them. And it would make little sense to conclude that, for example, the Attorney General and her assistants are not engaged in "official duties" related to law enforcement, and thus cannot obtain relevant Title III information, when they conduct a review of a law enforcement program that relies on such information, but that the Attorney General *is* engaged in a law enforcement duty, and thus may obtain such access, when she ultimately issues direction or guidance about that program. We therefore think that the duty to review and investigate law enforcement programs, like the duty to supervise those programs on a programmatic or policy level, qualifies as an "official dut[y]" related to law enforcement under section 2517(1).

Second, in providing its recommendations and analysis to the Attorney General, OIG is insulated to some degree from the Attorney General's direction and supervision. *See* 5 U.S.C. app. § 3(a) (providing that the Attorney General may not "prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation"); *id.* § 8E(a) (qualifying this limitation with respect to "audits or investigations . . . which require access to [certain] sensitive information"). Moreover, unlike other Department components or officials that

conduct fact-finding investigations or make recommendations to Department leadership, OIG exercises authority conferred directly by Congress in the IG Act, rather than authority shared with or delegated by the Attorney General. *Compare id.* §§ 4(a), 6(a) (granting various authorities to inspectors general) *with* 28 U.S.C. § 509 (vesting in the Attorney General, with certain minor exceptions, "[a]ll functions of other officers of the [Department] and all functions of agencies and employees of the [Department]") *and id.* § 510 (authorizing the Attorney General to "authoriz[e] the performance by any other officer, employee, or agency of the [Department] of any function of the Attorney General"). OIG thus falls in important respects outside the Department's chain of command when it conducts investigations and develops recommendations.

But OIG's relative independence from the Department's leadership does not in our view undermine the value of its reviews or advice, or mean that its "official dut[y]" to undertake such reviews and provide such advice is unrelated to the ultimate supervisory law enforcement decisions made by Department leadership. To the contrary, Congress created OIG precisely because it believed that establishing an independent and objective entity to evaluate the Department's programs and operations would *enhance* the quality of such evaluations. *See* H.R. Rep. No. 100-771, at 8–9 (1988) (explaining that a lack of independence impaired the effectiveness of the Department's internal audit and investigation components). We are reluctant to conclude that the relative independence that Congress determined would improve the value of OIG's reviews at the same time renders them insufficiently "related to law enforcement" to support disclosure of the Title III information OIG needs to perform such reviews effectively.

Consequently, we believe that OIG investigations and reviews that concern, or are designed to develop recommendations about, the manner in which the Department prevents, investigates, or prosecutes crimes "serve criminal law investigation and enforcement objectives" and "relate to law enforcement," as our *Title III Intelligence Community* opinion requires. 24 Op. O.L.C. at 265, 271 (internal quotation marks omitted). As a result, we think that OIG agents can obtain Title III information directly from Department investigative and law enforcement officers, for use in such investigations and reviews, based on the OIG agents' *own* "official duties" to conduct such reviews for the benefit of Department leadership—and not simply from Department leadership based on the leadership officials' duty to supervise Department operations.

Finally, although we have concluded that the "official duties" of Department leadership officials and OIG agents for Title III purposes encompass many of their responsibilities, it does not follow that disclosing Title III materials in connection with an OIG audit, investigation, or review is "appropriate to the proper performance of the official duties" of Department leadership or OIG agents in every instance. *Cf.* OIG 2014 Memorandum at 11. In particular, reviews that are either unrelated to, or have only an attenuated connection with, the conduct of the Department's law enforcement programs and operations do not, in our view,

constitute (or promise to assist with) "official duties" related to law enforcement. For example, it is unlikely that an OIG review of one of the Department's non-law enforcement activities, such as civil litigation, would be sufficiently related to the Department's law enforcement programs and operations to justify disclosure under section 2517(1), unless that review were aimed at uncovering criminal misconduct. Similarly, we doubt that a routine financial audit of a Department component, or a review of a component's record-keeping practices, would justify disclosure of Title III information under section 2517(1) merely because that component engaged in law enforcement activities. Although sound finances and good record-keeping may enable a law enforcement component to conduct its functions more effectively, such an audit or investigation would not be aimed at evaluating the conduct of law enforcement activities themselves, or uncovering criminal conduct by Department employees. Construing section 2517(1) to permit disclosure of Title III information in connection with reviews that are so tangentially related to law enforcement activities would reduce that provision to the kind of "highly elastic limitation on disclosure" among law enforcement and investigative officers that Congress did not intend. *Title III Intelligence Community*, 24 Op. O.L.C. at 265; *cf. Rural Housing Alliance v. U.S. Dep't of Agric.*, 498 F.2d 73, 81 (D.C. Cir. 1974) (rejecting a construction of the exemption for "investigatory files compiled for enforcement purposes" in the Freedom of Information Act, under which that exemption would encompass records from a compliance audit that might result in administrative or criminal sanctions, because that construction would cause the exemption to "swallow[] up the Act").

In sum, we conclude that section 2517(1) permits Department investigative or law enforcement officers to disclose Title III information to OIG agents in connection with many, but not all, OIG investigations and reviews. Line-level Department officers may disclose Title III information to OIG agents to assist the disclosing officers in preventing, investigating, or prosecuting criminal conduct. Any Department officer may disclose Title III information to OIG agents to assist OIG in its investigations of criminal misconduct by Department employees, contractors, or grantees, including administrative misconduct investigations that have a reasonable prospect of uncovering criminal violations. And because Department leadership officials have a duty to conduct policy and programmatic supervision of the Department's law enforcement activities—and because OIG has a duty to conduct investigations and reviews that could assist Department leadership in carrying out that supervision—any Department officer may disclose Title III information to assist OIG in performing such investigations and reviews where they concern, or are designed to develop recommendations about, the manner in which the Department prevents, investigates, or prosecutes crimes. Section 2517(1) does not, however, permit OIG agents to obtain Title III information in connection with reviews that are either unrelated to, or have only an attenuated relationship with, the conduct of the Department's law enforcement activities.

### B.

We now turn to OIG's eligibility to obtain grand jury materials. Federal Rule of Criminal Procedure 6(e) "codifies the traditional rule of grand jury secrecy," which is designed to ensure "the proper functioning of our grand jury system" by encouraging prospective witnesses to "come forward" and "testify fully and frankly," lessening the "risk that those about to be indicted w[ill] flee, or w[ill] try to influence individual grand jurors to vote against indictment," and protecting the innocent from "be[ing] held up to public ridicule." *Sells*, 463 U.S. at 424–25 (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218–19 (1979)). In order to achieve these objectives, Rule 6(e) prohibits several specified classes of individuals, including "attorney[s] for the government," from disclosing "a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). This rule of secrecy, however, is not absolute: A court may authorize the disclosure of grand jury materials in certain circumstances, *id.* 6(e)(3)(E), and an attorney for the government may disclose information without court authorization pursuant to several exceptions enumerated in subsection (3) of Rule 6(e).

OIG contends that these exceptions authorize its attorneys to receive grand jury materials that are relevant to OIG investigations. Principally, OIG argues that Department attorneys may disclose grand jury information to OIG under the exception set forth in Rule 6(e)(3)(A)(i) ("exception (A)(i)"), which permits the disclosure of grand jury information to "an attorney for the government for use in performing that attorney's duty." *See* OIG 2015 E-mail; OIG 2014 Memorandum at 9–10; OIG Supplemental Memorandum at 19–26. In addition, although OIG does not rely on the provision, we have considered whether OIG attorneys may obtain grand jury information under the exception set forth in Rule 6(e)(3)(A)(ii) ("exception (A)(ii)"), which authorizes disclosures to "any government personnel . . . that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law." For the reasons set forth below, we conclude that exception (A)(i) does not authorize Department attorneys to disclose grand jury materials to OIG attorneys, but that exception (A)(ii) authorizes disclosures to OIG officials in a wide range of circumstances, including in connection with OIG reviews that a member of Department leadership concludes could assist her in supervising the Department's criminal law enforcement programs and operations.[10]

---

[10] OIG also argues that it is entitled to disclosure of some grand jury materials under subsection 6(e)(3)(D) ("exception (D)"), which authorizes an attorney for the government to disclose grand jury material "involving foreign intelligence, counterintelligence . . . , or foreign intelligence information" to a range of officials, including "federal law enforcement . . . official[s]," in order to "assist the official receiving the information in the performance of that official's duties." *See* OIG Supplemental Memorandum at 26–45. We believe the applicability of exception (D) to OIG presents a difficult question. In light of our conclusion that exception (A)(ii) permits the Department leadership to provide

## 1.

We begin with exception (A)(i). It provides:

> Disclosure of a grand-jury matter—other than the grand jury's deliberations or any grand juror's vote—may be made to . . . an attorney for the government for use in performing that attorney's duty.

Fed. R. Crim. P. 6(e)(3)(A)(i). A person may make a disclosure under this provision without obtaining authorization from the court that impaneled the grand jury or notifying the court of the disclosure. *Cf. id.* 6(e)(3)(B), (E).

OIG argues that exception (A)(i) authorizes Department attorneys to disclose grand jury information to OIG attorneys for use in conducting any OIG audit, investigation, or review. OIG observes that, in a prior memorandum, this Office concluded that attorneys from the Department's Office of Professional Responsibility ("OPR") could obtain grand jury information under exception (A)(i) for use in investigating charges of misconduct by prosecutors or other Department employees who had assisted in grand jury investigations. *See* OIG Supplemental Memorandum at 20–22 (citing Memorandum for Michael Shaheen, Jr., Counsel, OPR, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Disclosure of Grand Jury Material to the Office of Professional Responsibility* (Jan. 6, 1984) ("OPR Memorandum")). OIG contends that because its attorneys, like OPR attorneys, are authorized to assist the Attorney General in supervising the Department, they qualify as "attorney[s] for the government" who may receive disclosures under exception (A)(i). *See* OIG 2015 E-mail. OIG further argues that its attorneys perform a "duty" closely analogous to OPR's when they investigate allegations of misconduct by the Department's law enforcement officers. OIG claims that as a result, exception (A)(i) likewise permits its attorneys to receive grand jury information in connection with its investigations. *See* OIG Supplemental Memorandum at 22–24.

The starting point for OIG's argument is *United States v. Sells Engineering*. In that case, the Supreme Court considered whether exception (A)(i) authorizes the Department's Civil Division to obtain grand jury materials for use in preparing and litigating civil lawsuits. *See* 463 U.S. at 420. The Court concluded first that Civil Division attorneys, like "virtually every attorney in the Department of Justice," were "within the class of 'attorneys for the government' to whom (A)(i) allows disclosure

---

OIG with access to grand jury material in a wide range of circumstances, *see infra* Part II.B.2, we decline to address the scope of exception (D) here. Rule 6(e)(3) also includes exceptions to Rule 6(e)'s secrecy requirements for (1) certain disclosures relating to banking matters and civil forfeiture authorized by 18 U.S.C. § 3322, *see* Fed. R. Crim. P. 6(e)(3)(A)(iii); (2) disclosures to another federal grand jury, *see id.* 6(e)(3)(C)); and (3) disclosures authorized by a court under certain conditions, *see id.* 6(e)(3)(E). We likewise do not address the application of those exceptions in this opinion.

without a court order." *Id.* at 426, 427–28. The Federal Rules of Criminal Procedure, the Court explained, define "attorneys for the government" to include "'authorized assistants of the Attorney General'"; and the Attorney General may direct almost "any attorney employed by the Department"—including Civil Division attorneys— "to conduct 'any kind of legal proceeding, civil or criminal, including grand jury proceedings.'" *Id.* at 428 (quoting Fed. R. Crim. P. 54(c) (1983); 28 U.S.C. § 515(a)).[11] It was therefore "immaterial," in the Court's view, that "certain attorneys happen[ed] to be assigned to a unit called the Civil Division, or that their usual duties involve[d] only civil cases." *Id.* Because such attorneys, notwithstanding such an assignment, could be detailed or assigned to conduct "criminal grand jury investigation[s]," they counted as "attorneys for the government" under the Rules. *Id.*

Nonetheless, the Court held that the use of grand jury information for civil purposes—even by an "attorney for the government" exercising her official duties—did not constitute "use in the performance of such attorney's duty" within the meaning of exception (A)(i).[12] In the Court's view, Congress did not intend exception (A)(i) to mean "that any Justice Department attorney is free to rummage through the records of any grand jury in the country, simply by right of office," *id.*, or to authorize access to grand jury material to serve "the general and multifarious purposes of the Department of Justice," *id.* at 429. The Court based its conclusion primarily on the purpose behind exception (A)(i). It explained that Rule 6(e) permits government attorneys to obtain otherwise secret grand jury materials only "because both the grand jury's functions and their own *prosecutorial* duties require it." *Id.* (emphasis in original); *see id.* at 428–29 (quoting Fed. R. Crim. P. 6(e) advisory committee's note (1944)). A prosecutor working on a criminal matter "needs to know what transpires before the grand jury," in order to "bring[] matters to the attention of the grand jury," "advise[] the lay jury on the applicable law," and "determine whether it is in the interests of justice to proceed with prosecution." *Id.* at 430. A civil attorney's "need for access," in contrast, "is ordinarily nothing more than a matter of saving [the] time and expense" of civil discovery. *Id.* at 431. As a result, "disclosure for civil use [is] unjustified by the considerations supporting prosecutorial access." *Id.* Moreover, the Court continued, granting attorneys the right to obtain grand jury materials for use in civil litigation would "threaten[] to do affirmative mischief." *Id.* Such a broad right of access might discourage witnesses from testifying before the grand jury "for fear that [they] will get [themselves] into trouble in some other forum," "tempt[]" prosecutors to "manipulate the grand jury's powerful investigative tools . . . to elicit evidence for use in a civil case," and

---

[11] Rule 54(c) was transferred to Rule 1(b)(1) when the Rules were amended in 2002.

[12] The language of this provision has been modified slightly since *Sells*. *Compare* Fed. R. Crim. P. 6(e)(3)(A)(i) (1979) ("an attorney for the government for use in the performance of such attorney's duty") *with* Fed. R. Crim. P. 6(e)(3)(A)(i) (2015) ("an attorney for the government for use in performing that attorney's duty"). We believe this change is immaterial for purposes of this opinion.

"subvert the limitations applied outside the grand jury context on the Government's powers of discovery and investigation." *Id.* at 432–33.

Significantly, the Court made clear that it did "not mean to suggest that (A)(i) access to grand jury materials is limited to those prosecutors who actually *did* appear before the grand jury." *Id.* at 429 n.11 (emphasis in original). Rather, the Court noted that "anyone working on a given prosecution would clearly be *eligible* under [the Federal Rules] to enter the grand jury room," even if such a person did not do so. *Id.* (emphasis in original). Accordingly, the Court found that the intent of the rule was to authorize "every attorney (including a supervisor) who is working on a prosecution [to] have access to grand jury materials, at least while he is conducting criminal matters," in order "to facilitate effective working of the prosecution team." *Id.* (emphasis omitted).

In the wake of the Supreme Court's decision in *Sells*, OPR asked this Office whether its attorneys could continue to obtain access to grand jury materials under exception (A)(i) when "investigating charges that prosecutors or Department employees assisting grand jury investigations ha[d] engaged in misconduct." OPR Memorandum at 1. In an unpublished memorandum that forms the basis for OIG's argument here, we advised that OPR attorneys could "probably" do so. *Id.* at 2. We acknowledged that "the broad language in *Sells*, on its face, would appear to prohibit automatic disclosure" to OPR attorneys, because they "would usually be using the materials for civil, not criminal, purposes"—i.e., in connection with administrative misconduct proceedings—and because "they are not the 'attorneys who conduct the criminal matters to which the materials pertain.'" *Id.* at 4 (quoting *Sells*, 463 U.S. at 427). Nonetheless, we observed that two "strong arguments [could] be made" in support of OPR's eligibility for disclosure under exception (A)(i). *Id.*

First, we noted that permitting the automatic disclosure of grand jury materials to OPR attorneys would not "raise[] the same type of policy concerns that were relied upon by the *Sells* Court." *Id.* at 6. The Civil Division attorneys in *Sells*, we explained, had sought grand jury materials "for possible use in civil actions against the targets of the grand jury inquiry," while OPR attorneys sought those materials "to oversee the conduct of the government attorneys and investigators assisting the grand jury." *Id*. at 4–5. Thus, unlike in *Sells*, "only the conduct of government prosecutors," and not the conduct of the targets of the grand jury inquiry, "would be subject to scrutiny." *Id*. at 5. As a result, disclosing grand jury materials to OPR attorneys would neither "hinder[]" the "willingness of witnesses to testify" nor "create an incentive for criminal attorneys to abuse the grand jury process in order to pursue civil discovery." *Id*.

Second, we believed that disclosures to OPR attorneys would "fall generally within the supervisor exception" articulated in *Sells*. *Id.* at 7. We noted that the *Sells* Court had recognized that grand jury materials could be "disclosed to some persons who may not technically be considered 'prosecutors,' such as Department 'supervisors' and members of the 'prosecution team,' but who nevertheless are indispensable to an effective criminal law enforcement effort." *Id*. at 6 (citation

omitted) (quoting *Sells*, 463 U.S. at 429 n.11). We thought this exception "would clearly cover certain exchanges [of grand jury information]" that were "analogous" to disclosures to OPR. *Id*. In particular, we thought there was "no question" that prosecutors could "ask ethics counselors to accompany them into the grand jury room to give direct counsel when problems [arose]," or that prosecutors could "disclose grand jury materials to their superiors," as well as to "ethics attorneys" advising those superiors, in order "to seek their instructions on ethical responsibilities." *Id.* at 7. We therefore thought it probable, although "not free from doubt," that, by the same logic, Department attorneys could obtain grand jury materials "to evaluate in the course of a separate administrative investigation the propriety of prior conduct." *Id*. We reasoned that, "[t]o perform properly their oversight role, supervisors not only must be able to review grand jury materials for purposes of instructing subordinates on future activities, but also must be able to evaluate that conduct once a course of action has been set." *Id*. "A supervisor's access to grand jury materials," we explained, "should not be terminated artificially once his subordinates have acted, but should properly include *post mortem* review of his staff's activities." *Id*. at 7–8. We further noted that OPR attorneys are, by regulation, "delegee[s] of the Attorney General for purposes of overseeing and advising with respect to the ethical conduct of department attorneys." *Id.* at 8 (citing 28 C.F.R. § 0.39a (1983)). Accordingly, we concluded that it was appropriate for OPR attorneys to review grand jury materials in order to "make recommendations to the Attorney General or other supervisors regarding conduct in particular cases." *Id.*[13]

OIG argues that it is eligible to receive grand jury materials under exception (A)(i) for much the same reason as OPR attorneys. OIG asserts that its attorneys qualify as "attorney[s] for the government" because they are charged with "assisting the [Attorney General] in [her] capacity of overseeing the operations of the Department." OIG 2015 E-mail. And OIG argues that its investigations and reviews are comparable to the work performed by OPR attorneys, and thus qualify as "dut[ies]" for which OIG may receive grand jury information, because OIG, like OPR, performs those investigations to "oversee[] and advis[e] with respect to the ethical conduct" of Department personnel, and to assist members of the Department's leadership in "evaluat[ing] . . . the propriety of prior conduct" and improving the Department's law enforcement policies and programs. OPR Memorandum at 7–8; *see* OIG Supplemental Memorandum at 22–24.

We think that OIG is correct that its duties are similar to OPR's in important respects; indeed, for the reasons described in Part II.B.2 below, we believe that OIG

---

[13] Recognizing, however, that the broad language in *Sells* could be read to prohibit automatic disclosure of grand jury materials to OPR attorneys, we suggested "as a prudential matter" that OPR seek a court order sanctioning disclosure under exception (A)(i) in the first few cases in which it reviewed grand jury materials so that it might "obtain some clear guidance from the courts on whether the automatic exemption may be employed." OPR Memorandum at 9.

personnel may obtain grand jury information under exception (A)(ii) in part because of their responsibility to assist Department leadership in supervising the Department's law enforcement functions. *See infra* pp. 33–34. But we disagree that OIG attorneys qualify as "attorney[s] for the government" within the meaning of the Federal Rules. As we explain below—and as both *Sells* and numerous courts of appeals have confirmed—an "attorney for the government" under the Rules must not merely assist the Attorney General, but must (at a minimum) be capable of conducting criminal proceedings on behalf of the government. Because the IG Act prohibits OIG personnel from engaging in such activities, OIG attorneys cannot qualify for disclosure under exception (A)(i).

The Rules define an "attorney for the government" as:

> (A) the Attorney General or an authorized assistant;

> (B) a United States attorney or an authorized assistant;

> (C) when applicable to cases arising under Guam law, the Guam Attorney General or other person whom Guam law authorizes to act in the matter; and

> (D) any other attorney authorized by law to conduct proceedings under these rules as a prosecutor.

Fed. R. Crim. P. 1(b)(1). Most of the categories listed in this definition clearly consist of attorneys who are authorized to conduct criminal proceedings on behalf of the government. The Attorney General is authorized to "conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings," 28 U.S.C. § 515(a); United States Attorneys are charged with "prosecut[ing] . . . all offenses against the United States," *id.* § 547(1); attorneys for the government acting in Guam criminal cases must be "authorize[d] to act in th[os]e matter[s]" under Guam law; and "other attorney[s]" must be "authorized by law to conduct proceedings under [the Rules] as a prosecutor." Only the "authorized assistant[s]" to the Attorney General and United States Attorneys described in subparagraphs (A) and (B) are not in plain terms limited to attorneys who are authorized to represent the government in criminal proceedings. In isolation, the phrase "authorized assistant" might be read to encompass persons who "assist[]" the Attorney General or a United States Attorney in ways other than by conducting prosecutions (such as by conducting the kinds of investigations of misconduct or law enforcement programs undertaken by OIG). Read in context, however, we think that the term "authorized assistant" in subparagraphs (A) and (B) refers, like the other categories in Rule 1(b)(1), to prosecutors or other attorneys with authority to conduct criminal proceedings on the government's behalf. This is so for at least three reasons.

First, the text of Rule 1(b)(1) supports this reading. The word "authorized" in "authorized assistant" must be read in light of the meaning it has in the other parts

of the same provision. As noted, subsection (C) refers to persons "whom Guam law *authorizes* to act in [a] [criminal] matter," and subsection (D) refers to other attorneys "*authorized* by law to conduct proceedings under these rules as a prosecutor" (emphases added). Because "similar language contained within the same section of a statute must be accorded a consistent meaning," *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998), it is reasonable to presume that Congress used the term "authorized" in a similar sense in subsections (A) and (B), to refer to official authorization to conduct proceedings under the Rules as a prosecutor, or otherwise to "act" in a criminal proceeding in an official capacity. As noted above, moreover, the other categories of government attorneys listed in Rule 1(b)(1) are clearly authorized to conduct criminal proceedings. In that context, the term "authorized assistant" is best read to refer as well to attorneys who are authorized to conduct criminal proceedings. *See United States v. Williams*, 553 U.S. 285, 294 (2008) (noting that "a word is given more precise content by the neighboring words with which it is associated"). Additionally, the catchall category set forth in subsection (D) refers to "any *other* attorney authorized by law to conduct proceedings under these rules as a prosecutor" (emphasis added). That formulation reinforces our conclusion that the preceding categories in the Rule consist of attorneys authorized by law to conduct proceedings under the rules as a prosecutor. *See Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) ("Here, [18 U.S.C.] § 2259(b)(3)(F) defines a broad, final category of 'other losses suffered . . . as a proximate result of the offense.' That category is most naturally understood as a summary of the type of losses covered—*i.e.*, losses suffered as a proximate result of the offense." (ellipsis in original)).

Second, consistent with this reading, *Sells* and many lower court decisions have held or assumed that an "authorized assistant" to the Attorney General must be an attorney who is, or at least may be, authorized to conduct criminal proceedings on the government's behalf. As noted, *Sells* concluded that Civil Division attorneys qualify as "authorized assistant[s] of the Attorney General" because the Attorney General may assign them to "conduct a criminal grand jury investigation" or other criminal matters. *Sells*, 463 U.S. at 428 (citing 28 U.S.C. §§ 515(a), 518(b)). The Attorney General's authority to reassign attorneys in this way would be pertinent only if the Court thought that an "authorized assistant" had to be capable of conducting criminal matters on the government's behalf. Courts of appeals have interpreted the phrase even more strictly. The Sixth Circuit, for instance, has held that "an 'authorized assistant of the Attorney General' is one whose superiors have assigned him or her to work in some official capacity on the criminal proceeding." *United States v. Forman*, 71 F.3d 1214, 1220 (6th Cir. 1995) (emphasis omitted). Other courts of appeals have reached similar conclusions. *See Sells*, 463 U.S. at 429 n.12 (citing courts of appeals that had "held or assumed that" even a Criminal Division attorney could qualify as an "'*authorized* assistant of the Attorney General'" only if she had actually been "authorized to conduct grand jury proceedings" (emphasis in original)); *United States v. Fort*, 472 F.3d 1106, 1111

(9th Cir. 2007) ("Rule 1(b)(1) defines restrictively the term 'attorney for the government' to mean (as relevant here) a federal prosecutor."); *United States v. Balistrieri*, 779 F.2d 1191, 1207 (7th Cir. 1985) (holding that attorneys employed by the Department's Criminal Division were "authorized assistants of the Attorney General" and thus "attorneys for the government" because they "were assigned to assist the United States Attorney for the Eastern District of Wisconsin in investigating and prosecuting" a criminal case). There is some apparent tension between the conclusion in *Sells* that any attorney who *could be* authorized to conduct criminal proceedings qualifies as an "attorney for the government," *see* 463 U.S. at 428, and the conclusions of other courts that an actual authorization is required, *see, e.g.*, *Forman*, 71 F.3d at 1220. But we need not attempt to resolve this tension here, because at a minimum, all courts agree that an attorney who is incapable of being authorized to conduct criminal proceedings on the government's behalf is not an "authorized assistant" for purposes of the Federal Rules.

Third, numerous provisions of the Federal Rules make clear that an "attorney for the government," including an authorized assistant to the Attorney General, refers to an attorney capable of representing the government in criminal proceedings—a meaning that makes sense given the Rules' purpose of establishing the "procedure" governing "all criminal proceedings in the United States [courts]." Fed. R. Crim. P. 1(a)(1); *see Robinson v. Shell Oil Co.*, 519 U.S. 337, 345 (1997) (resolving the meaning of a statutory term by considering "[t]he broader context provided by other sections of the statute"). More than 50 provisions of the Rules use the term "attorney for the government," and all are consistent with this understanding. For example, Rule 11(c) provides that "[a]n attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement." Fed. R. Crim. P. 11(c)(1). Rule 12.1 provides that "[a]n attorney for the government may request in writing that the defendant notify an attorney for the government of any intended alibi defense," *id*. 12.1(a)(1), and that, following such a request, "the defendant must serve written notice on an attorney for the government of any intended alibi defense," *id*. 12.1(a)(2). Rule 14 provides that "[b]efore ruling on a defendant's motion to sever [his trial from a codefendant's], the court may order an attorney for the government to deliver to the court for in camera inspection any defendant's statement that the government intends to use as evidence." *Id*. 14(b). And Rule 26.2 provides that "[a]fter a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce . . . any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." *Id*. 26.2(a). A person who lacks authority to appear in a criminal matter on behalf of the government could not perform these or many other functions assigned to "attorney[s] for the government" by the Federal Rules.

OIG attorneys cannot qualify as "authorized assistant[s]," or any other type of "attorney for the government," under this standard. As an initial matter, nothing in the

IG Act authorizes OIG attorneys to conduct criminal proceedings. *See* 5 U.S.C. app. §§ 4(a), 6(a), 8E(b) (listing OIG's duties and authorities). Ordinarily, 28 U.S.C. § 515 and related statutes permit the Attorney General to delegate to any "officer of the Department of Justice," or to any "attorney specially appointed by the Attorney General," the authority to conduct criminal proceedings on the government's behalf. 28 U.S.C. § 515(a); *see also id.* §§ 518(b), 543(a). But section 9(a) of the IG Act provides that the Attorney General may transfer "functions, powers, [and] duties" to OIG only if those functions are "properly related to the functions of [OIG]," transferring them would "further the purposes of th[e] Act," and the functions do not constitute "program operating responsibilities." 5 U.S.C. app. § 9(a), (a)(2); *see also Authority to Conduct Regulatory Investigations*, 13 Op. O.L.C. at 61 (stating that the IG Act prohibits inspectors general from "conduct[ing] investigations constituting an integral part of the programs involved" (internal quotation marks omitted)). The duty to conduct grand jury or other criminal proceedings on behalf of the United States is unrelated to OIG's statutory functions of investigation, auditing, and oversight. *See* 5 U.S.C. app. § 4(a). Transferring criminal litigating responsibilities to OIG would undermine its independence—preservation of which is one of the principal concerns of the Act—by making its attorneys "responsible official[s]" who "set and implement [Department] policy" at the same time as they oversee and critique it. *Authority to Conduct Regulatory Investigations*, 13 Op. O.L.C. at 61. And the conduct of criminal litigation is one of the Department's central program operating responsibilities. *See* 28 U.S.C. §§ 515(a), 516, 519. The plain language of section 9(a) therefore bars the Attorney General from assigning this responsibility to OIG.

The IG Act's legislative history further supports this reading of section 9(a). When Congress initially enacted the IG Act in 1978, the House Report explained that "Inspector[s] General would not conduct prosecutions or decide whether prosecutions should or should not be conducted." H.R. Rep. No. 95-584, at 13 (1977). And when Congress extended the IG Act to the Department in 1988, the House Report responded to concerns that OIG's creation would interfere with the Department's law enforcement functions: "[P]rosecution of suspected violations of Federal law and the conduct of litigation are parts of the basic mission or program functions of the Department of Justice," the Report explained, "[and] the [IG] [A]ct does not authorize inspectors general to engage in program functions." H.R. Rep. No. 100-771, at 9. "[I]n fact," the Report continued, "[section 9(a)] specifically prohibits the assignment of such responsibilities to an inspector general." *Id.* at 9 & n.48. The Conference Report accompanying the 1988 amendments likewise indicated that OIG personnel would not be permitted to engage in prosecutorial functions, noting that "[t]he conferees do not intend that the IG should render judgments on the exercise of prosecutorial or other litigative discretion in a particular case or controversy." H.R. Rep. No. 100-1020, at 25 (Conf. Rep.).

Because section 9(a) prohibits the Attorney General from transferring to OIG the authority to conduct criminal proceedings, the Attorney General may not assign OIG that authority pursuant to 28 U.S.C. § 515 or similar general delegation

statutes. As we have noted, different statutes that regulate the same subject matter must be read *in pari materia* and given full effect to the extent possible. *See Morton*, 417 U.S. at 551. If a general delegation statute such as 28 U.S.C. § 515 were construed to permit assignments to OIG that section 9(a) prohibits, then section 9(a) would be effectively inapplicable to the Department and many agencies subject to the IG Act, because numerous statutes grant the heads of agencies equally broad or broader authority to delegate their statutory functions to subordinate officers. *See, e.g.*, 28 U.S.C. § 510 (providing that the Attorney General may authorize "*any* other officer" of the Department to perform "*any* function of the Attorney General" (emphases added)); 6 U.S.C. § 112(b)(1) (granting similar authority to the Secretary of Homeland Security); 20 U.S.C. § 3472 (Secretary of Education); 31 U.S.C. § 321(b)(2) (Secretary of the Treasury). It is in our view implausible that Congress intended section 9(a) to have such a limited effect, particularly in light of the legislative history expressing Congress's belief that this provision would in fact prohibit OIG from engaging in prosecution or litigation. *See* H.R. Rep. No. 100-1020, at 25 (Conf. Rep.); H.R. Rep. No. 100-771, at 9; H.R. Rep. No. 95-584, at 13. We therefore think that, given the absence of any indication of congressional intent to the contrary, section 9(a)—a specific provision limiting the transfer of functions to inspectors general—is best construed as an exception to general delegation provisions, like 28 U.S.C. § 515(a), that broadly authorize the assignment of the Department's functions to any subordinate officer or attorney. *See infra* p. 49 (explaining that if "a general permission or prohibition is contradicted by a specific prohibition or permission," then "the specific provision is construed as an exception to the general one," absent strong "textual indications that point in the other direction" (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071–72 (2012))).

As a result, while the analysis in our OPR memorandum might inform the question whether OIG investigations and reviews qualify as "dut[ies]" justifying disclosure of grand jury materials under exception (A)(i), OIG attorneys are unlike OPR attorneys in at least one critical respect. Like "virtually every attorney in the Department of Justice," OPR attorneys may in principle be delegated the Attorney General's authority to conduct criminal proceedings for the Department. *Sells*, 463 U.S. at 426; *see id.* at 428; OPR Memorandum at 8 (noting that OPR attorneys are "delegee[s] of the Attorney General"). But OIG attorneys, as we have discussed, are barred from being assigned this authority under the IG Act. Consequently, although OIG personnel may seek to use grand jury materials in a manner that parallels the use discussed in our OPR Memorandum, they do not fall within the category of persons—attorneys for the government—who may obtain disclosure under exception (A)(i).[14]

---

[14] OIG contends that multiple district court decisions have determined that OIG attorneys qualify for disclosure under exception (A)(i), and questions whether this Office may render a legal opinion

## 2.

Because exception (A)(i) does not authorize the disclosure of grand jury materials to OIG, we have also considered whether a separate exception would authorize that disclosure. Exception (A)(ii) provides:

> Disclosure of a grand-jury matter—other than the grand jury's deliberations or any grand juror's vote—may be made to . . . any government personnel—including those of a state, state subdivision, Indian tribe, or foreign government—that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law.

Fed. R. Crim. P. 6(e)(3)(A)(ii). Like disclosure under exception (A)(i), disclosure under this exception may be made without prior judicial approval. However, unlike

disagreeing with those decisions. *See* OIG 2014 Memorandum at 15 & att. The decisions OIG cites are one-page memorandum orders, issued by a single district judge, that authorized disclosure to OIG attorneys under exception (A)(i). The relevant parts of the orders state, in their entirety, that because a particular OIG investigation of "alleged misconduct before the grand jury" was "supervisory in nature with respect to ethical conduct of Department employees," "disclosure of grand jury materials to the OIG constitutes disclosure to 'an attorney for the government for use in the performance of such attorney's duty'" under exception (A)(i). *In re Matters Occurring Before the Grand Jury Impaneled July 16, 1996*, Misc. No. 39 (W.D. Okla. June 4, 1998) (Russell, C.J.) (order) (quoting Fed. R. Crim. P. 6(e)(3)(A)(i)); *id.* (Dec. 8, 1998) (same); *see id.* (Nov. 15, 1999) ("Because in taking such actions, these Department personnel would be engaged in a supervisory function, disclosure of grand jury materials to them constitutes disclosure to 'an attorney for the government for use in the performance of such attorney's duty.'"). Neither these orders, nor the underlying Department filings that sought disclosure, discussed or analyzed the meaning of the terms "attorney for the government" or "authorized assistant." As the Supreme Court has explained, a "'decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.'" *Camreta v. Greene*, 131 S. Ct. 2020, 2033 n.7 (2011) (quoting 18 J. Moore et al., *Moore's Federal Practice* § 134.02[1][d] (3d ed. 2011)). Nor is a district court decision binding on the Executive Branch in activities unrelated to the case in which the court's decision was rendered. *See In re Exec. Office of the President*, 215 F.3d 20, 24–25 (D.C. Cir. 2000) (per curiam). Consistent with this rule, the Office has previously disagreed with district court decisions after independently analyzing the questions presented and reaching contrary conclusions, including where the court espoused a view previously advanced by the Department. *See, e.g.*, *Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act*, 35 Op. O.L.C. __, at *3–4 (Sept. 20, 2011) (available at http://www.justice.gov/olc/opinions.htm) (disagreeing with the decisions of courts that had adopted a position previously advanced by the Criminal Division); *Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation*, 25 Op. O.L.C. 33, 52 (2001) (disagreeing with the "unexplained decision" of a district court that appeared to interpret the Antideficiency Act in a manner "inconsistent with the Antideficiency Act's legislative history and evolution and with the rest of the (limited) caselaw"); *Authority of the President to Remove the Staff Director of the Civil Rights Commission and Appoint an Acting Staff Director*, 25 Op. O.L.C. 103, 105 (2001) (disagreeing with a district court decision subsequently vacated as moot). For the reasons offered above, we respectfully disagree with the district court's conclusion that OIG attorneys may qualify for disclosure under exception (A)(i) solely because they perform supervisory functions.

in the case of disclosures under exception (A)(i), the Rules provide that an attorney for the government must "promptly provide the court that impaneled the grand jury with the names of all persons to whom a disclosure has been made" under exception (A)(ii), and "certify that the attorney has advised those persons of their obligation of secrecy under this rule." *Id.* 6(e)(3)(B). And a person to whom information is disclosed under this exception "may use that information only to assist an attorney for the government in performing that attorney's duty to enforce federal criminal law." *Id.*

OIG employees clearly qualify as "government personnel" who may receive disclosures under this exception. The language of that phrase is broad—particularly when considered in light of the Rule's explanation that it extends to personnel of a "state, state subdivision, Indian tribe, or foreign government"—and comfortably encompasses OIG employees. *Id.* 6(e)(3)(A)(ii). In addition, we have previously observed that the use of the permissive phrase "considers necessary" in exception (A)(ii) suggests that "Congress intended federal prosecutors to have broad leeway in deciding what government personnel should have access to grand jury materials for purposes of facilitating enforcement functions." *Disclosure of Grand Jury Matters to the President and Other Officials*, 17 Op. O.L.C. 59, 62 (1993) ("*Disclosure to the President*").[15] Consistent with this broad understanding of the term, we have advised that exception (A)(ii) permits disclosures to law enforcement officers, members of the intelligence community, and senior Administration officials, among others. *See Rule 6(e) Intelligence Community*, 21 Op. O.L.C. at 161; *Disclosure to the President*, 17 Op. O.L.C. at 61. *See generally Sells*, 463 U.S. at 436 (explaining that exception (A)(ii) was prompted by the need to make disclosures to individuals such as "accountants" and "handwriting experts"); Fed R. Crim. P. 6 advisory committee's note (1977 Amendments) ("The phrase 'other government personnel' includes, but is not limited to, employees of administrative agencies and government departments."). OIG employees are likewise "government personnel" who may receive disclosures under exception (A)(ii).

In addition, a wide variety of Department attorneys qualify as "attorney[s] for the government" who may authorize disclosures under this exception. As we have discussed, that term includes the Attorney General, United States Attorneys, their "authorized assistant[s]," and "any other attorney authorized by law to conduct proceedings under these rules as a prosecutor"—and thus extends to any Department attorney who is (and perhaps any Department attorney who may be) authorized to

---

[15] Consistent with our prior opinions, we presume that Congress intended "necessary" in this context to mean useful or conducive, rather than strictly required. *See Disclosure to the President*, 17 Op. O.L.C. at 61 (stating that exception (A)(ii) permits disclosure "for purposes of obtaining . . . assistance"); *Rule 6(e) Intelligence Community*, 21 Op. O.L.C. at 161 (similar); *cf., e.g., McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 415 (1819) (construing the word "necessary" in the Necessary and Proper Clause to mean "convenient," "useful," or "conducive"); *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 504 (D.C. Cir. 2003) (deferring to agency's interpretation of "necessary" in telecommunications statute as referring to "a strong connection" between means and ends).

conduct criminal proceedings on behalf of the federal government. Fed. R. Crim. P. 1(b)(1); *see supra* pp. 25–27.

The scope of permissible disclosure to OIG officials under exception (A)(ii) thus turns on the circumstances in which a Department attorney—including a member of Department leadership—may reasonably "consider[]" an OIG official "necessary to assist in performing that attorney's duty to enforce federal criminal law." Fed. R. Crim. P. 6(e)(3)(A)(ii). This Office has previously noted several relatively straightforward ways in which this language limits the permissible scope of disclosures. To begin with, consistent with the plain language of this provision, a Department attorney may make a disclosure only for the purpose of obtaining assistance in performing her duty to enforce "federal *criminal* law." *Id.* (emphasis added). Thus, an attorney may not authorize disclosures under exception (A)(ii) to assist in the performance of her civil or administrative duties, or to senior White House policymakers for purposes of "general policymaking." *Disclosure to the President*, 17 Op. O.L.C. at 61–62, 64; *see Sells*, 463 U.S. at 427. We have also observed that, because disclosures under exception (A)(ii) may be made only to a person that a Department attorney "considers necessary to assist in performing *that* attorney's duty," Fed. R. Crim. P. 6(e)(3)(A)(ii) (emphasis added), an attorney may not make disclosures to assist in the performance of duties she herself does not hold. *See Rule 6(e) Intelligence Community*, 21 Op. O.L.C. at 171. In addition, we have advised that the same phrase requires that any disclosure be made "in accordance with an actual determination made by an attorney." Memorandum for Philip B. Heymann, Assistant Attorney General, Criminal Division, and William P. Tyson, Acting Director, Executive Office for United States Attorneys, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Computerized Preservation and Use of Grand Jury Material* at 4 (May 2, 1980). Hence, while an attorney has "broad leeway" in judging what disclosures are proper, *Disclosure to the President*, 17 Op. O.L.C. at 62 (citing S. Rep. No. 95-354, at 8 (1977)), she must always exercise her independent judgment before authorizing the disclosure of grand jury information to a particular recipient. Thus, for example, we concluded that an attorney could not place grand jury materials on a computerized database that law enforcement officers could use for purposes of which the attorney was unaware. *See* Memorandum for Roger B. Clegg, Acting Assistant Attorney General, Office of Legal Policy, and John Mintz, Assistant Director and Legal Counsel, FBI, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Authority of FBI Agents to Exchange Grand Jury Material Pursuant to Rule 6(e)(3)(A)(ii) of the Federal Rules of Criminal Procedure* (Feb. 14, 1984) ("Shanks Memorandum").

Within these limitations, we believe exception (A)(ii) permits Department attorneys to authorize the disclosure of grand jury information to OIG both to assist with individual law enforcement actions and, where the disclosures are authorized by members of the Department leadership, to assist in the direction and supervision of the Department's law enforcement programs and operations. First, because an

attorney's "duty to enforce federal criminal law" plainly includes his duty to prosecute criminal offenses, exception (A)(ii) permits Department attorneys to authorize disclosure of grand jury materials to OIG in connection with OIG investigations and reviews those attorneys believe could assist them with ongoing or potential prosecutions. Exception (A)(ii) was drafted specifically in order to enable prosecutors to make disclosures to investigators who could develop the basis for and aid in prosecutions. *See Sells*, 463 U.S. at 436 (stating that exception (A)(ii) was enacted "because Justice Department attorneys found that they often need active assistance from . . . investigators from the [FBI], IRS, and other law enforcement agencies"); Fed. R. Crim. P. 6 advisory committee's note (1977 Enactment) (stating that "[o]ften the prosecutors need the assistance of the agents in evaluating evidence" or conducting "further investigation"). As we have discussed, OIG agents have a number of investigative duties, and are required to "report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law." 5 U.S.C. app. § 4(d); *see Investigative Officers*, 14 Op. O.L.C. at 109. Hence, a Department attorney may authorize disclosure of information to OIG in connection with an OIG investigation that the attorney concludes will be likely to aid in an ongoing or potential prosecution in which the attorney is involved.

Second, we think that exception (A)(ii) permits a Department leadership official to authorize disclosure of grand jury information to OIG in connection with OIG investigations or reviews that the official believes could assist her in carrying out her duty to conduct programmatic or policy supervision of the Department's criminal law enforcement activities. As we discussed in analyzing the scope of permissible disclosure under Title III, programmatic and policy supervision can affect the prevention, investigation, or prosecution of criminal conduct as directly as individual trial decisions, *see Van de Kamp*, 555 U.S. at 346, and constitute a central means by which the Attorney General and her assistants direct and control the Department's law enforcement and prosecutorial functions. *See supra* pp. 14–15. Such activities are thus part of Department leadership's "duty to enforce federal criminal law" under the plain language of that phrase. Further, it would be reasonable for a member of Department leadership to "consider[]" many OIG reviews "necessary to assist" her in performing this duty. Fed. R. Crim. P. 6(e)(3)(A)(ii). As we also noted in the Title III context, Congress established OIG to "keep[] the head of the [Department] . . . informed about problems" in the Department and to recommend "corrective action," 5 U.S.C. app. § 2(3), and OIG's reviews have historically provided the Department's leadership with "critical advice, information, and insights in connection with the exercise of their supervisory responsibilities over the Department's criminal law enforcement programs, policies, and practices," Yates Letter at 3. It would therefore generally be reasonable for a member of Department leadership to conclude that an OIG investigation or review that concerns, or is designed to develop recommendations about, the manner in which the Department enforces federal criminal law is "necessary

to assist" in the disclosing official's supervision of that function on a programmatic or policy basis.

We acknowledge that certain language in *Sells* might be read to suggest a narrower scope of appropriate disclosures. In particular, various statements in the opinion could be read to suggest that an attorney's "duty" under exception (A)(i) includes only her duty to conduct or supervise a particular pending prosecution. *See, e.g.*, *Sells*, 463 U.S. at 427 ("We hold that (A)(i) disclosure is limited to use by those attorneys who conduct the criminal matters *to which the materials pertain*." (emphasis added)); *id.* at 429 n.11 (stating that "every attorney (including a supervisor) who is *working on a prosecution* may have access to grand jury materials, at least while he is conducting criminal matters" (emphasis added)); *id.* at 438 (noting that the "primary objection" to a proposal to allow disclosures to other governmental personnel was a concern that they would use grand jury information "to pursue civil investigations *or unrelated criminal matters*" (emphasis added)). And although *Sells* concerned exception (A)(i)—which authorizes disclosures for use in performing an attorney's "duty"—rather than exception (A)(ii)—which authorizes disclosure in connection with an attorney's "duty to enforce federal criminal law"— the *Sells* Court explained that the "criminal-use limitation" in exception (A)(ii) "merely ma[de] explicit what [Congress] believed to be already implicit in the existing (A)(i) language." *Id.* at 436. This suggests that the Court would have viewed its analysis of the limitations on exception (A)(i) as applicable to exception (A)(ii) as well. Thus, it might be argued that programmatic and policy supervision does not fall within an attorney's "duty to enforce federal criminal law" because it differs from the duties discussed in *Sells* in two respects: first, it involves supervision of law enforcement agents in addition to prosecutors; and second, it concerns criminal matters unrelated to the grand jury investigation in which the information to be disclosed was developed. It might also be argued that disclosure to OIG is different from the disclosures contemplated in *Sells* because OIG will frequently use grand jury information to investigate past conduct in completed law enforcement operations, rather than to assist in ongoing prosecutions.

In our view, however, notwithstanding these distinctions, *Sells* and subsequent opinions support reading exception (A)(ii) to permit disclosures to OIG in connection with Department leadership's duties of programmatic and policy supervision. With respect to the first arguable distinction—between supervision of law enforcement officers and supervision of prosecutors—*Sells* expressly recognized that a prosecutor's authority to "command[]" law enforcement officers is a critical means by which she carries out her prosecutorial duties and renders assistance to the grand jury. *Sells*, 463 U.S. at 430 (stating that "a modern grand jury would be much less effective without the assistance of the prosecutor's office and the investigative resources it commands"); *id.* at 430 n.13 ("Not only would the prosecutor ordinarily draw up and supervise the execution of subpoenas, but also he commands the investigative forces that might be needed to find out what the grand jury wants to know."). Moreover, as *Sells* also recognized (and as we noted above),

Congress added exception (A)(ii) in part to ensure that prosecutors could obtain the assistance of law enforcement officers in developing the basis for and conducting prosecutions. *See id.* at 436. *Sells* therefore fully supports the proposition that the duty to supervise prosecutions includes a duty to supervise law enforcement officers in conduct that assists with prosecutions.

We likewise believe that the second arguably distinctive characteristic of programmatic and policy supervision—that it concerns criminal matters unrelated to the grand jury investigation in which the materials being sought were originally developed—is consistent with *Sells*. Lower courts, treatises, and this Office have repeatedly interpreted *Sells* to permit disclosure in connection with *any* "criminal matters to which [grand jury] materials pertain," *id.* at 427, and not merely those matters in which the information was developed. *See, e.g.*, *Impounded*, 277 F.3d 407, 413 (3d Cir. 2002) (holding that the disclosure of grand jury materials to a federal prosecutor in another district was permissible under exception (A)(i)); 1 Sara Sun Beale et al., *Grand Jury Law and Practice* § 5:8, at 5-58 (2d ed. 2014) ("Beale") (stating that an attorney may make a disclosure under exception (A)(i) "in connection with a separate prosecution"); Shanks Memorandum at 2 (concluding that exception (A)(ii) authorizes disclosure to FBI agents assisting in "a specific criminal investigation" unrelated to the initial grand jury investigation); *cf.* Fed. R. Crim. P. 6(e)(3)(C) (permitting the automatic disclosure of grand jury materials to "another federal grand jury"). This Office has also previously concluded that the disclosure authorization in exception (A)(ii) extends to general supervision of law enforcement activities as well as to specific prosecutions: In our *Rule 6(e) Intelligence Community* opinion, for example, we advised that the Attorney General may make disclosures to assist "a broad criminal law enforcement program for which [she] is responsible," 21 Op. O.L.C. at 171; and in our *Disclosure to the President* opinion, we cited legislative history supporting the view that "Congress intended federal prosecutors to have broad leeway in deciding what government personnel should have access to grand jury materials for purposes of facilitating enforcement functions," 17 Op. O.L.C. at 62. *See also* 1 Beale § 5:8, at 5-58 (stating that attorneys may disclose materials "in connection with the evaluation or planning of broad prosecutorial policies").

Consistent with these authorities, we do not think the language in *Sells* referring to specific "prosecutions," *e.g.*, 463 U.S. at 429 n.11, should be read to preclude disclosures that an attorney believes could aid the general supervision of the Department's law enforcement programs and activities. To begin with, the Court in *Sells* addressed the permissibility of disclosure only in connection with civil litigation, *see id.* at 420; it did not discuss, and had no occasion to address, the permissible scope of disclosure in connection with programmatic supervision of criminal law enforcement. Moreover, other language in the opinion is consistent with permitting disclosure for broad supervisory purposes. The Court expressly noted that exception (A)(ii) gives prosecutors a "free hand concerning use of grand jury materials" in connection with criminal matters. *Id.* at 441–42; *see also*

*Disclosure to the President*, 17 Op. O.L.C. at 62 (noting the "broad leeway" possessed by attorneys under exception (A)(ii)). Further, permitting disclosure for broad supervisory purposes would not raise the policy concerns that led the *Sells* Court to deem disclosure for civil purposes unlawful: because such disclosure would not be used in connection with investigating the subjects of or witnesses in the underlying grand jury investigations, it would not discourage witnesses from testifying, create incentives for prosecutors to misuse the grand jury, or subvert limits on civil discovery. *See Sells*, 463 U.S. at 432–34; OPR Memorandum at 4–6 (similarly distinguishing *Sells* on this basis). In addition, prohibiting such disclosure would have the same kinds of disruptive effects we identified in connection with Title III, by preventing Department leadership from obtaining (or disclosing) Rule 6(e) information for the purpose of conducting policy or programmatic supervision of grand jury proceedings or other law enforcement programs that used grand jury information. For all these reasons, we doubt that if the Supreme Court had squarely addressed the question, it would have concluded that exception (A)(ii) does not permit the Attorney General and her assistants to obtain or disclose grand jury information in order to set policies and develop guidance for law enforcement purposes.

Finally, while it is true that OIG officials would frequently use grand jury information to evaluate completed law enforcement operations rather than to assist in ongoing operations or prosecutions, "supervisors . . . must be able to evaluate [past] conduct once a course of action has been set" to "perform properly their oversight role." OPR Memorandum at 7. As we explained in our OPR Memorandum, "*post mortem* review" of the conduct of a prosecution is necessary to evaluate and, if appropriate, take administrative action with respect to that conduct. *Id.* at 8. OIG investigations and reviews of the past conduct of Department criminal law enforcement programs likewise help Department leadership evaluate that conduct and take appropriate corrective action if necessary. We therefore believe that, notwithstanding the apparently narrow language in *Sells*, Department leadership's "duty to enforce federal criminal law" includes its duties to supervise Department law enforcement efforts on a programmatic and policy basis, and that it would generally be reasonable for Department leadership to "consider[]" it "necessary to assist" it in performing these duties to authorize the disclosure of grand jury information to OIG in connection with investigations or reviews that concern, or are designed to develop recommendations about, the manner in which the Department carries out its criminal law enforcement functions. Fed. R. Crim. P. 6(e)(3)(A)(ii).

As in the Title III context, however, we do not think that exception (A)(ii) would permit Department attorneys to disclose grand jury material to OIG in relation to *all* OIG audits, investigations, and reviews. In particular, we doubt that a Department leadership official may authorize disclosures in connection with investigations that are only tangentially related to programmatic and policy supervision of law enforcement activities, such as routine financial audits of components that happen

to engage in law enforcement functions. Similarly, especially in light of *Sells*, we do not believe a Department attorney may authorize disclosure of grand jury information to OIG in connection with OIG investigations or reviews that primarily relate to civil enforcement or recovery efforts (such as investigations designed to assist the Department in recovering funds through a False Claims Act suit), rather than criminal prosecutions.

## C.

The third and final statutory prohibition on disclosure we consider is section 626 of FCRA. Congress enacted FCRA to ensure "fair and accurate credit reporting," which it deemed "essential to the continued functioning of the banking system." 15 U.S.C. § 1681(a)(1). FCRA comprehensively regulates the "confidentiality, accuracy, relevancy, and proper utilization" of information held by consumer credit reporting agencies. *Id.* § 1681(b). Among other things, it restricts the circumstances in which consumer reporting agencies may disclose consumer credit reports, *id.* § 1681b; specifies what information may be contained in those reports, *id.* § 1681c; and imposes civil, administrative, and sometimes criminal liability for failure to comply with its requirements, *id.* §§ 1681n–1681s.

In 1996, Congress amended FCRA to add a new basis for disclosure of consumer credit information. *See* Intelligence Authorization Act of 1996, Pub. L. No. 104-93, sec. 601(a), § 624, 109 Stat. 961, 974 (codified at 15 U.S.C. § 1681u). The new provision, now FCRA section 626, authorizes the FBI to present a consumer credit reporting agency with a written request, signed by the Director of the FBI or his designee, certifying that the FBI seeks certain information "for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities." 15 U.S.C. § 1681u(a). Upon receipt of such a National Security Letter ("NSL"), a credit agency must disclose to the FBI the "names and addresses of all financial institutions . . . at which a consumer maintains or has maintained an account," *id.*, and "identifying information respecting a consumer, limited to name, address, former addresses, places of employment, or former places of employment," *id.* § 1681u(b). Section 626(f) bars further dissemination of this information except in limited circumstances. It provides:

> The Federal Bureau of Investigation may not disseminate information obtained pursuant to this section outside of the Federal Bureau of Investigation, except to other Federal agencies as may be necessary for the approval or conduct of a foreign counterintelligence investigation, or, where the information concerns a person subject to the Uniform Code of Military Justice, to appropriate investigative authorities within the military department concerned as may be necessary for the conduct of a joint foreign counterintelligence investigation.

*Id.* § 1681u(f). FCRA makes any violation of this section by a federal agency or officer grounds for civil damages or disciplinary action. *Id.* § 1681u(i)–(j).

OIG argues that under the terms of section 626(f), it may obtain unrestricted access to consumer information that the FBI has obtained under section 626. In OIG's view, it is exempt from the limitations on disclosure contained in section 626(f) because it is part of the same agency as the FBI. *See* OIG 2014 Memorandum at 12–13; OIG FCRA Memorandum at 3. We consider this argument below. In addition, although OIG does not make the argument, we consider whether OIG may obtain section 626 information under the first exception set forth in section 626(f), which permits the FBI to make disclosures "to other Federal agencies as may be necessary for the approval or conduct of a foreign counterintelligence investigation." 15 U.S.C. § 1681u(f). As we will explain, we conclude that although OIG is subject to section 626(f)'s prohibition on disclosure, it may nonetheless obtain covered information under that provision's first exception in certain circumstances.

## 1.

OIG argues that it is permitted to obtain section 626 information from the FBI in connection with any of its audits, investigations, or reviews. It contends that, while section 626(f) bars the FBI from disclosing information obtained pursuant to an NSL to "other Federal agencies," except "as may be necessary for the approval or conduct of a foreign counterintelligence investigation," this bar does not apply to OIG because both OIG and the FBI are components of the Department. *See* OIG FCRA Memorandum at 3. OIG argues that this reading of section 626(f) is supported by the text of that provision's first exception, by implication from a statute enacted subsequent to section 626, and by the general purposes of OIG reviews. *See* OIG 2014 Memorandum at 12–14; OIG FCRA Memorandum at 2–4.

OIG's interpretation is difficult to square with the plain language of the statute. Section 626(f) states that the FBI "may not disseminate information obtained pursuant to this section outside of the Federal Bureau of Investigation" except in two specific circumstances. On its face, this provision unambiguously bars the FBI from disclosing information outside of the FBI, unless an exception applies. OIG is outside of the FBI, and so falls within this prohibition on disclosure. OIG's argument—that it is exempt from the prohibition because it is a Department component—would require reading "Federal Bureau of Investigation" to mean "Department of Justice." But these two entities are not equivalent, and Congress chose to refer to the former rather than the latter in section 626(f).

OIG disputes this straightforward reading of section 626(f) by pointing to the provision's first exception, which permits the FBI to disclose section 626 information to "other Federal agencies." OIG reasons that because other components of the Department are part of the same agency as the FBI, and "not an 'other Federal agency'" relative to the FBI, they cannot qualify for disclosure under

this exception. OIG FCRA Memorandum at 2. As a consequence, this argument continues, reading section 626(f) as its plain text indicates would lead to the unlikely result that the FBI could never disclose section 626 information to Department officials outside the FBI—a result that, as OIG explains, would be inconsistent with the Department's longstanding practice of making section 626 information available to the National Security Division ("NSD") for purposes of overseeing the FBI's operations. *See id.*

We agree that it is highly unlikely that Congress would have barred the FBI from disclosing section 626 information within the Department, particularly while permitting such disclosure to agencies outside the Department. However, we disagree that the statute's reference to "other Federal agencies" compels such a result. Although the term "agency" is sometimes used to refer to the Department of Justice as a whole, it is also used to refer to components within the Department. *Compare* 28 U.S.C. § 527 (distinguishing between "the Department of Justice" and "other Federal agencies") *and* 5 U.S.C. § 5721(1)(A) ("[f]or the purpose of this subchapter . . . 'agency' means . . . an Executive agency") *with* 28 U.S.C. § 509 (vesting "all functions of agencies and employees of the Department of Justice" in the Attorney General) *and* 5 U.S.C. § 551 ("For the purpose of this subchapter . . . 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency."). In our view, the term "agency" is best read in the latter sense in section 626(f). Notably, the statute does not simply state that the FBI "may not disseminate [section 626 information], except to other Federal agencies" for certain purposes; it says the FBI "may not disseminate [section 626 information] *outside the FBI*, except to other Federal agencies" for those purposes. 15 U.S.C. § 1681u(f) (emphasis added). The express reference to "outside the FBI" strongly suggests that "other Federal agencies" refers to any federal entity other than the Federal Bureau of Investigation, including other components of the Department.

This conclusion is reinforced by the significant role that other Department components play in "the approval or conduct of [the FBI's] foreign counterintelligence investigation[s]." *Id.* For decades, the Attorney General has been authorized to "supervis[e]" and "establish" "regulations" concerning the FBI's counterintelligence activities. Exec. Order No. 12333, § 1.14, 46 Fed. Reg. 59941, 59949 (Dec. 4, 1981); *see The Attorney General's Guidelines for Domestic FBI Operations* at 5 (Sept. 2008) ("*AG Guidelines*") (available at http://www.justice. gov/sites/default/files/ag/legacy/2008/10/03/guidelines.pdf, last visited July 20, 2015) (setting guidelines for the conduct of domestic FBI operations, including "counterintelligence activities"); Memorandum for the Director, FBI, et al., from the Attorney General, *Re: Intelligence Sharing Procedures for Foreign Intelligence and Foreign Counterintelligence Investigations Conducted by the FBI* (Mar. 6, 2002); 28 C.F.R. § 0.72 (assigning counterintelligence oversight functions to NSD). By permitting disclosure for the "approval" of counterintelligence investigations, Congress presumably intended to permit the FBI to make disclosures consistent with

this longstanding grant of supervisory authority. Indeed, a prior version of the bill would have made the first exception applicable *exclusively* to disclosures within the Department of Justice. *See* Comprehensive Terrorism Prevention Act of 1995, S. 735, 104th Cong. § 502(a) (1995) ("The [FBI] may not disseminate information obtained pursuant to this section outside of the [FBI], except . . . to the Department of Justice, as may be necessary for the approval or conduct of a foreign counterintelligence operation."). It is unlikely that, in later broadening the scope of the exception to allow disclosures to "other Federal agencies," Congress intended to exclude disclosures to the agency that was previously the exception's sole beneficiary.

OIG also argues that its view that section 626(f) permits disclosure to OIG finds support in a statutory provision Congress enacted after section 626: section 119 of the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192, 219 ("Patriot Reauthorization Act"). As OIG points out, section 119 of the Patriot Reauthorization Act directed OIG to "perform an audit of the effectiveness and use, including any improper or illegal use, of national security letters issued by the Department of Justice," including NSLs issued pursuant to section 626. *Id.* § 119(a), (g)(4). OIG argues that "[f]ulfilling the mandates of the Patriot Reauthorization Act . . . clearly required [it] to have access to the 'raw data' the Department obtained through [NSLs], including Section [626] credit report information." OIG 2014 Memorandum at 13. And because that Act "contained no provision granting the OIG access to Section [626] information," OIG reasons that "in 2005 Congress believed the OIG *already had* access to FCRA information in order to audit such dissemination." *Id.* (emphasis added). But this provision suggests at most that the Congress that enacted the Patriot Reauthorization Act believed OIG would have access to section 626 information as necessary for OIG to evaluate the legality and effectiveness of the Department's use of NSLs. And for reasons we explain below, we believe OIG is eligible to receive section 626 information for that purpose under section 626(f)'s first exception. *See infra* Part II.C.2. The Patriot Reauthorization Act thus does not provide a basis for reading section 626(f), contrary to its plain text, to grant OIG unfettered access to such information.

Finally, OIG contends that the limits on dissemination contained in section 626 were intended to protect consumer privacy, and that it would undermine rather than further that purpose to prohibit OIG from obtaining the information necessary to determine whether the FBI is abiding by section 626's requirements. *See* OIG 2014 Memorandum at 12–13; OIG FCRA Memorandum at 3. We agree that, in enacting section 626, Congress sought to build "safeguards . . . into the legislation" that would "minimiz[e]" the "threat to privacy" posed by the FBI's ability to use NSLs. H.R. Rep. No. 104-427, at 36 (1995); *see also* 15 U.S.C. § 1681(a)(4) (finding "a need to insure that consumer reporting agencies exercise their grave responsibilities with . . . a respect for the consumer's right to privacy"). But it is entirely consistent with Congress's purpose of protecting consumer privacy to prevent broad disclosure of consumer information even *within* the Department of Justice. Nor would a

restriction on disclosure outside the FBI necessarily preclude all oversight of the use of section 626 authority, insofar as the FBI's internal audit department or Office of Professional Responsibility could conduct reviews of the use of that authority. Further, as we explain below, we believe OIG may obtain section 626 information in order to monitor the FBI's compliance with FCRA's disclosure restrictions pursuant to section 626(f)'s first exception. The statute's purpose thus does require OIG to have blanket access to section 626 information.

## 2.

We now consider whether OIG is eligible to receive disclosures under section 626(f)'s first exception, which authorizes the FBI to disclose information obtained pursuant to an NSL "to other Federal agencies as may be necessary for the approval or conduct of a foreign counterintelligence investigation." 15 U.S.C. § 1681u(f). As we have discussed, components of the Department outside the FBI, including OIG, are "other Federal agencies" within the meaning of this provision. *See supra* pp. 38–40. Consequently, this exception permits OIG to obtain access to section 626 information "as may be necessary for the approval or conduct of a foreign counterintelligence investigation." 15 U.S.C. § 1681u(f).

In our view, this language authorizes disclosure in two broad circumstances. First, and most straightforwardly, it authorizes disclosures as necessary to facilitate approval of a particular foreign counterintelligence investigation, or to obtain assistance in conducting such an investigation.[16] For example, the first exception would allow the FBI to disclose information to Department attorneys in order to enable those attorneys to file an application for electronic surveillance pursuant to Title III or the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801 *et seq.*, or to advise the FBI on the legality of a method the FBI proposes to use in an investigation. In addition, the first exception would allow the FBI to disclose information to Department supervisors to enable them to monitor a particular foreign counterintelligence operation, to ensure that it was being conducted lawfully and in conformance with Department guidelines.

Second, we believe that section 626(f)'s first exception permits disclosure of information as necessary for the programmatic and policy supervision of foreign counterintelligence investigations generally—that is, to ensure that investigations are (or were) approved or conducted in accordance with applicable statutes, regulations, and guidelines; to identify systemic problems in the approval or conduct of investigations; and to update guidelines and procedures in response to identified deficiencies. It is true that section 626(f) authorizes disclosures only as necessary for the approval or conduct of "*a* foreign counterintelligence *investigation*." But Congress has instructed that "unless the context indicates otherwise . . . words

---

[16] As in the case of Rule 6(e)(3)(A)(ii), we presume that Congress used the word "necessary" to mean useful or conducive rather than required. *See supra* note 15.

importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1; *see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1681 (2012) (explaining that the meaning of the word "a" and its variants "turns on its context"). In this case, we have not found any indication in the statute or its legislative history—apart from the use of the phrase "a[n] . . . investigation" itself—that Congress intended to permit disclosures in connection with only one investigation at a time. Nor, of particular relevance here, can we find any indication that Congress intended to prevent Department leadership officials from obtaining information protected by section 626(f) for use in supervising the FBI's conduct of foreign counterintelligence investigations. In a manner similar to that discussed in the Title III and Rule 6(e) contexts, Department leadership would be severely constrained in its ability to supervise the FBI's conduct of such investigations on a programmatic or policy basis, and to supervise the FBI's use of NSLs issued pursuant to section 626 on a similar basis, if it could not obtain section 626 information for that purpose. Indeed, under guidance issued by Department leadership, the FBI routinely provides section 626 information to other Department components to assist in such supervision. *See, e.g.*, *AG Guidelines* at 10–11 (authorizing disclosure of section 626 information to NSD for supervisory purposes). And, as noted above, Congress likewise assumed in the Patriot Reauthorization Act that OIG would be able to obtain the "raw data" needed to conduct a review of the FBI's use of NSLs. *See supra* p. 40. In light of these considerations, we believe that section 626(f)'s first exception permits the FBI to disclose section 626 information not only to obtain assistance in "the approval or conduct" of a particular foreign counterintelligence investigation, but also to aid in supervision of "the approval or conduct" of foreign counterintelligence investigations generally.

OIG may in principle obtain section 626 information under either of these rationales. It appears unlikely that the FBI would need to disclose section 626 information to OIG to obtain assistance in the approval or conduct of a particular foreign counterintelligence investigation, since OIG involvement in such investigations would generally entail exercising "program operating responsibilities" that the Attorney General may not assign to OIG. 5 U.S.C. app. § 9(a); *see also Authority to Conduct Regulatory Investigations*, 13 Op. O.L.C. at 61–62. However, there might be rare circumstances in which a foreign counterintelligence investigation was intertwined with an investigation of internal misconduct. In such circumstances, it is conceivable that OIG could obtain section 626 information to facilitate the conduct of that investigation.

In other circumstances, OIG could obtain information under the broader supervisory rationale. As we have noted elsewhere, OIG plays a central role in helping Department leadership supervise the Department's law enforcement activities through both reviews of misconduct and programmatic reviews intended to help improve law enforcement operations in the future. *See supra* pp. 16–18, 33–34. In the context of section 626, it is reasonable to conclude that OIG investigations and reviews that could

inform decisions by Department leadership concerning supervision of foreign counterintelligence investigations—such as OIG's congressionally-mandated review of the FBI's use of NSLs—are "necessary for the approval or conduct of" those investigations within the meaning of section 626(f). An OIG review of foreign counterintelligence investigations could, for example, lead to changes in the process for authorizing such investigations, or help leadership officials ensure that investigations are carried out lawfully. Indeed, OIG's review of the FBI's use of NSLs illustrates how such a process might work. After that review uncovered serious problems with the FBI's use of NSLs, the Department implemented a number of measures aimed at ensuring greater supervision and control of the FBI's activities. *See Fact Sheet: Department of Justice Corrective Actions on the FBI's Use of National Security Letters* (Mar. 20, 2007) (available at http://www.justice.gov/archive/opa/pr/ 2007/March/07_nsd_168.html, last visited July 20, 2015) ("*Corrective Actions on the FBI's Use of NSLs*"). These measures included retrospective and continuing audits of the FBI's NSL usage designed to identify potential legal violations, as well as measures intended to allow the Attorney General to promptly address needed changes in policy, training, and oversight. *Id.* Because investigations and reviews of this kind concern, or are designed to develop recommendations about, leadership decisions regarding the approval or conduct of foreign counterintelligence investigations, they are in our view "necessary to the approval or conduct" of such investigations as that phrase is used in section 626(f).

This reading of section 626(f) is further supported by the FBI's practice of providing information obtained through NSLs to NSD to facilitate NSD's supervision of the FBI's compliance with applicable laws and guidelines in matters relating to national security and foreign intelligence. *See AG Guidelines* at 10–11. OIG correctly notes that NSD was given responsibility to oversee the FBI's activities following OIG's critical review of the FBI's use of NSLs, and that NSD's reviews are patterned after OIG reviews. *See* NSD E-mail; *see also* OIG FCRA Memorandum; *Corrective Actions on the FBI's Use of NSLs*. It would be incongruous to conclude that the FBI may disseminate section 626 information to NSD because its reviews are "necessary for the approval or conduct of a foreign counterintelligence investigation," but that the FBI is barred from providing the same information to OIG in connection with reviews that share a similar purpose and methodology, and likewise assist the Department's leadership in its supervisory functions. For reasons similar to those set forth in our discussion of Title III, *see supra* p. 18, we do not believe that OIG's relative independence from the Department's leadership makes its reviews less valuable to leadership, or less "necessary for the approval or conduct" of foreign counterintelligence investigations, than the comparable reviews performed by NSD.

Accordingly, we conclude that the FBI may disseminate section 626 information to OIG in connection with investigations and reviews that concern, or are designed to develop recommendations about, leadership decisions regarding the approval or conduct of foreign counterintelligence investigations. This conclusion, however, is

subject to the same limitation we have explained in other contexts: OIG audits, investigations, and reviews that have only an attenuated connection to Department leadership's supervisory responsibilities relating to foreign counterintelligence investigations, such as routine financial audits of the FBI entities that carry out such investigations, would likely not qualify for disclosure under section 626. *See supra* pp. 18–19, 36–37 (discussing similar limit in the context of Title III and Rule 6(e) disclosures).

\* \* \* \* \*

In sum, Title III, Rule 6(e), and FCRA permit the disclosure of covered information in connection with many of OIG's investigations and reviews. Title III permits a Department investigative or law enforcement officer to disclose to OIG the contents of intercepted communications to the extent that disclosure could aid either the disclosing official or OIG in the performance of their respective duties related to law enforcement—including duties related to Department leadership's programmatic or policy supervision of the Department's law enforcement activities. Rule 6(e), similarly, permits the disclosure of grand jury materials to OIG if an attorney for the government determines that such disclosure could assist her in the performance of her criminal law enforcement duties, including any supervisory law enforcement duties that attorney may have. And FCRA permits the FBI to disclose to OIG consumer information it obtained pursuant to section 626, if such a disclosure could assist in the approval or conduct of foreign counterintelligence investigations, including in the supervision of such investigations on a programmatic or policy basis.[17]

These statutes do not, however, authorize Department officials to disclose protected information to OIG in connection with all of OIG's activities. As we have noted, Title III and Rule 6(e) do not permit disclosures that have either an attenuated or no connection with the conduct of the Department's criminal law enforcement programs and operations, and section 626 of FCRA does not permit disclosures that have either an attenuated or no connection with the approval or conduct of foreign counterintelligence investigations. Thus, for example, Title III, Rule 6(e), and section 626 do not permit OIG to obtain covered information to assist in investigations of the Department's civil activities that are only tangentially related to criminal law enforcement or foreign counterintelligence efforts, or to conduct routine financial audits of Department components. Even when these statutes permit disclosures to OIG, moreover, they impose certain procedural preconditions on those disclosures.

---

[17] You have not asked, and this opinion does not address, what further disclosures OIG may make of sensitive information it receives under Title III, Rule 6(e), or FCRA. We stress, however, that nothing in this opinion is intended to suggest that OIG may disclose protected materials in a public report. Information received by OIG remains subject to the statutory restrictions on disclosure, and OIG may further disclose that information only to the extent permitted by those restrictions and any other applicable laws.

Disclosures under Title III require an assessment of whether a particular OIG investigation is appropriate to the proper performance of an official duty related to law enforcement. Disclosures under Rule 6(e) require an independent judgment, made by an attorney for the government, that OIG assistance is necessary to perform that attorney's duty to enforce criminal law, and further require compliance with certain additional procedural obligations. And disclosures under section 626 of FCRA require an assessment of whether an OIG investigation is "necessary for the approval or conduct" of foreign counterintelligence investigations.

If section 6(a)(1) of the IG Act displaced the limitations on disclosure in these statutes, it would—unlike these statutory exceptions—permit unconstrained disclosure of all protected information to OIG. Thus, OIG could receive information protected by Title III, Rule 6(e), and section 626 in connection with its investigations of the Department's civil activities, its routine financial or administrative audits, and any other of its authorized activities. Moreover, information already available to OIG under the terms of Title III, Rule 6(e), and section 626 would be available without a prior assessment of whether that information was related to the Department's law enforcement functions or the FBI's conduct of foreign counterintelligence investigations, and, in the case of Rule 6(e) information, without a prior determination by an attorney for the government that OIG assistance was necessary to assist in performing the attorney's duty to enforce federal criminal law. Because section 6(a)(1) would thus provide OIG with access to protected information in more circumstances and on broader terms than are provided for in Title III, Rule 6(e), and section 626 themselves, we must consider whether section 6(a)(1) overrides the limits imposed by those statutes.

### III.

In this Part, we address whether section 6(a)(1) overrides the disclosure limitations in Title III, Rule 6(e), and section 626. We first discuss the general interpretive principles that will guide our analysis, concluding that only a clear statement of congressional intent to override conflicting statutes would be sufficient to abrogate the detailed prohibitions on disclosing sensitive information contained in Title III, Rule 6(e), and section 626. We then analyze the text, structure, and history of the IG Act to determine whether it contains such a clear statement. Finding that it does not, we conclude that the Department remains bound by Title III, Rule 6(e), and section 626 when it responds to OIG requests under section 6(a)(1), and thus that it may not disclose information covered by those statutes outside the circumstances permitted by the statutes themselves.

### A.

Both the Supreme Court and this Office have repeatedly confronted apparent conflicts between statutes that address the same subject matter. Two lines of

authority are particularly relevant here. In the first, the Court and this Office have considered whether statutory provisions protecting highly sensitive information can be overridden by competing statutory rights of access. In the second, which is sometimes intertwined with the first, the Court and this Office have considered the circumstances in which a general statute can be construed to override a more specific statutory provision. In addressing these subjects, the Court and this Office have identified two salient interpretive principles that will guide our analysis.

First, in a range of contexts—including contexts involving information protected by Rule 6(e) and Title III—the Supreme Court and this Office have declined to infer that Congress intended to override statutory limits on the disclosure of highly sensitive information about which Congress has expressed a special concern for privacy, absent a clear statement of congressional intent to that effect. In *Illinois v. Abbott & Associates, Inc.*, 460 U.S. 557 (1983), for example, the Court held that an antitrust statute authorizing state attorneys general to obtain, "to the extent permitted by law, any investigative files or other materials" relevant to an antitrust suit, 15 U.S.C. § 15f(a) (1976), did not supersede the limits of Rule 6(e). 460 U.S. at 565. The Court relied primarily on the statute's use of the phrase "to the extent permitted by law," which it read to exclude from the statute's scope any disclosures not authorized by Rule 6(e). *Id*. at 566–69. But in response to the argument that such a reading would frustrate the statute's purpose by "severely limit[ing] the amount of additional disclosure to state attorneys general" it made possible, *id*. at 572, the Court further explained that because the rule of grand jury secrecy was "so important, and so deeply-rooted in our traditions," it would "not infer that Congress has exercised [the] power [to modify it] without affirmatively expressing its intent to do so," *id.* at 572–73.

The Court and this Office have since applied this clear statement rule to Rule 6(e) information on multiple occasions. In *Sells*, discussed above, the Court concluded that Department attorneys could not disclose grand jury information for use in civil cases in part because "the long-established policy" and "importan[ce]" of grand jury secrecy meant that, "[i]n the absence of a clear indication in a statute or Rule," the Court "must always be reluctant to conclude that a breach of [grand jury] secrecy has been authorized." 463 U.S. at 424–25 (internal quotation marks omitted); *see id.* at 435 (refusing to adopt a "plausible" but broad construction of exception (A)(i) in light of the policy of grand jury secrecy and the Rule's legislative history). And in our *Rule 6(e) Intelligence Community* opinion, this Office concluded that section 104(a) of the National Security Act, which granted the Director of Central Intelligence access to "*all* intelligence related to the national security," did not "override grand jury secrecy restrictions" because it did not "clearly manifest an intent to reach grand jury information." 21 Op. O.L.C. at 165 (emphasis added); *see also* Memorandum for Richard K. Willard, Assistant Attorney General, Civil Division, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Authority of the FBI to Transfer Restricted Records to the*

*National Archives and Records Administration* at 2 (Feb. 27, 1986) ("FBI NARA Memorandum").

This Office has concluded that "a similar approach is appropriate" to the protection of Title III information. *Title III Intelligence Community*, 24 Op. O.L.C. at 273. In our *Title III Intelligence Community* opinion, we considered whether the same provision of the National Security Act addressed in our *Rule 6(e) Intelligence Community* opinion, section 104(a), superseded Title III's limits on the disclosure of the contents of electronic communications. We reasoned that even though "Title III does not have the historical roots of the grand jury secrecy rule," we should be similarly reluctant to conclude that Congress had abrogated Title III's limits. *Id.* This was so, we explained, because of the strong "privacy interests underlying" and reflected in Title III, and the "constitutional concerns" that might be raised by permitting government entities to broadly disclose the contents of intercepted communications between private parties. *Id.* at 272–73 (citing *In re Application of Nat'l Broad. Co.*, 735 F.2d 51 (2d Cir. 1984)); *see also Scott*, 436 U.S. at 132 (noting that *Berger* and *Katz* "proscribed" the "indiscriminate use of wire surveillance" (internal quotation marks omitted)). We also observed that "[n]othing in the language of section 104(a) . . . refers to Title III information," and that "there is nothing in the legislative history of that section that suggests that Congress considered Title III information" in enacting that statute. *Title III Intelligence Community*, 24 Op. O.L.C. at 272. We therefore advised that "in the absence of at least some evidence that Congress intended to create a new exception to Title III's limits on disclosure," section 104(a) of the National Security Act should not be read to "permit otherwise prohibited disclosure of Title III information to members of the intelligence community." *Id.* at 273. Likewise*,* facing an apparent conflict between Title III and a statute authorizing the FBI to transfer records to the National Archives and Records Administration, we explained that because Title III, like Rule 6(e), "enact[s] [a] strict rule[] of secrecy," makes violations of the rule a felony, and "protect[s] highly important privacy rights," its provisions had to "take precedence" over the statute governing transfers to the National Archives, absent "evidence that Congress contemplated" the transfer of Title III information to the Archives. FBI NARA Memorandum at 2.

We have not previously considered whether a similar clear statement rule should apply to information protected by section 626 of FCRA. But we have applied much the same clear statement rule to other highly sensitive information, in addition to Title III and Rule 6(e) information, that Congress has protected from disclosure through statutes that suggest a special concern for privacy. For instance, we concluded in 1977 that "any doubts" about Congress's intent to permit disclosure of tax return information "should be resolved in favor" of confidentiality, in light of the "rigid safeguards" Congress set up in the statute and the strict penalties that Congress imposed for unauthorized disclosure. *Transfer of Watergate Special Prosecution Task Force Records to the National Archives*, 1 Op. O.L.C. 216, 218–19 (1977) ("Watergate NARA Opinion"); *see id.* at 219 (advising that disclosure of

such records would be lawful only if there were "explicit legislative authorization"). Reaffirming this conclusion in 1986, we explained that the reasons for applying a clear statement rule to tax return information were "similar" to those underlying the rule for Title III and Rule 6(e) information: the language of all three statutory regimes, together with their legislative history, "express[ed] a strong congressional intent to maintain very strict privacy for such information." FBI NARA Memorandum at 1–2. Similarly, we have long concluded that in light of "the federal government's longstanding commitment to confidentiality" of census information, and the "broad confidentiality protection[s]" that Congress enacted for such information, we must not infer that a statute authorizes its disclosure unless "the evidence of congressional intention compel[s] such a conclusion." Memorandum for Cameron F. Kerry, General Counsel, Dep't of Commerce, from Jeannie S. Rhee, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Census Confidentiality and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001* at 8 (Jan. 4, 2010) ("*Census Confidentiality*"); *see also Confidential Treatment of Census Records*, 40 Op. Att'y Gen. 326, 328 (1944); *United States v. Bethlehem Steel Corp.*, 21 F.R.D. 568, 572 (S.D.N.Y. 1958) (stating that "the purpose to protect the privacy of [census] information . . . is so clear and the public policy underlying the purpose so compelling" that authority to abrogate that privacy should not be inferred "absent a clear Congressional grant").

In our view, the logic of these opinions, and of the prior opinions concerning Rule 6(e) and Title III information, extends to section 626 of FCRA. All of these opinions involved highly sensitive information with respect to which Congress has "expressed a strong congressional intent to maintain very strict privacy" in various ways, including through "strict" or "rigid" rules of secrecy applicable to government officials, FBI NARA Memorandum at 1–2; Watergate NARA Opinion, 1 Op. O.L.C. at 219; penalties for unauthorized disclosure, FBI NARA Memorandum at 2–3; Watergate NARA Opinion, 1 Op. O.L.C. at 218; and, in some but not all circumstances, a "long-established policy" of confidentiality, *Sells*, 463 U.S. at 424; *Census Confidentiality* at 8; *cf. Title III Intelligence Community*, 24 Op. O.L.C. at 273 (noting that "Title III does not have the historical roots of the grand jury secrecy rule"). Further, "the privacy interests at stake" in these opinions were "not primarily those of the government but of third parties, such as taxpayers and grand jury witnesses," whose rights the federal government has "a duty to protect." FBI NARA Memorandum at 3; *accord Title III Intelligence Community*, 24 Op. O.L.C. at 273. As discussed above, section 626, like Rule 6(e), Title III, and the statutes governing protection and disclosure of tax return and census information, imposes a strict duty of confidentiality, enforced by penalties for improper disclosure. *See supra* Part II.C; 15 U.S.C. § 1681u(f), (i)–(j). Further, section 626 information, like grand jury, Title III, tax return, and census information, is highly sensitive information about private individuals rather than the government—indeed, it is information that the government may have obtained without the subject's

knowledge. *See* 15 U.S.C. § 1681u(d) (authorizing the FBI to bar the provider of section 626 information, in certain circumstances, from informing others about the disclosure). We thus think there is a strong argument that the federal government has a similar "duty to protect [the statutory privacy] rights" in section 626 unless "Congress's command is clear." FBI NARA Memorandum at 3. *See generally Sossamon v. Texas*, 131 S. Ct. 1651, 1661 (2011) ("'[C]lear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation.'" (alteration in original) (quoting *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality opinion))).

A second general principle, complementary to and often applied in conjunction with the first, also informs our analysis. Where the Court and this Office have faced apparent conflicts between two competing statutes, they have frequently resolved the question by applying the "rule of relative specificity." This "cardinal axiom of statutory construction," *GAO Access to Trade Secret Information*, 12 Op. O.L.C. 181, 182 (1988) ("*GAO Access*"), holds that "[w]here there is no clear [congressional] intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment," *Morton*, 417 U.S. at 550–51. Under this rule, if "a general permission or prohibition is contradicted by a specific prohibition or permission," then "the specific provision is construed as an exception to the general one," absent strong "textual indications that point in the other direction." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071–72 (2012); *see, e.g.*, *Morton*, 417 U.S. at 535 (construing section 12 of the Indian Reorganization Act of 1934 as an exception to the Equal Employment Opportunity Act of 1972). This rule ensures that congressional commands are followed to the fullest extent possible, by giving effect to the more focused or particularized expression of Congress's will on the particular question at hand.

Applying the rule of relative specificity, we have often concluded that statutes barring the disclosure of particular types of information by particular entities, subject to particular exceptions, take precedence over statutes broadly entitling an entity to examine federal records. In our *GAO Access* opinion, for instance, we determined that a statute prohibiting the Food and Drug Administration from disclosing trade secrets except to certain specified individuals and entities took precedence over 31 U.S.C. § 716(a), a statute providing that "[e]ach agency shall give the Comptroller General information [he] requires about the duties, powers, activities, organization, and financial transactions of the agency." *See* 12 Op. O.L.C. at 182. "Since [the trade secrets statute] is a specific statute directly addressing one executive branch agency's handling of trade secret information, while [the Comptroller General statute] is a general statute addressed to all kinds of information in possession of the executive branch," we reasoned, "[the trade secrets statute] controls in the absence of congressional intent to the contrary." *Id*. at 182–83. Applying the same reasoning, we later concluded that section 716(a) also had to give way to a "specific provision" that restricted "which recipients" could obtain

certain employment information from the Department of Health and Human Services "and under what circumstances." Memorandum for William B. Schultz, Acting General Counsel, Dep't of Health and Human Services, from John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Whether the Department of Health and Human Services May Provide the Government Accountability Office Access to Information in the National Directory of New Hires* at 6 (Aug. 23, 2011). In yet another opinion, we concluded that this principle required that a statute specifically regulating "the disclosure of information received pursuant to" the National Traffic and Motor Vehicle Safety Act "prevails over" the Federal Reports Act, which "deals with . . . the general matter of the intragovernmental exchange of information." *Disclosure of Confidential Business Records Obtained Under the National Traffic and Motor Vehicle Safety Act*, 4B Op. O.L.C. 735, 736 (1980).

In other instances, we have concluded that the rule of relative specificity operates in tandem with the clear statement rule protecting highly sensitive information about which Congress has expressed a special concern for privacy. For instance, we have repeatedly stated that the rule of relative specificity, in conjunction with the other clear statement rule discussed above, favors the "subsequently enacted, more specific prohibition" on the disclosure of tax returns contained in 26 U.S.C. § 6103 over the "general access provisions" permitting the Archivist of the United States to obtain the records, including the confidential records, of any federal agency. *National Archives Access to Taxpayer Information*, 21 Op. O.L.C. 92, 94–95 (1997). We reasoned that Congress had provided that "tax returns and tax return information would be disclosed only under the carefully prescribed conditions set out in" section 6103, and thus that it would be "unrealistic to assume that Congress intended (but neglected to mention) that such materials would also be subject to disclosure under the Archives provisions." FBI NARA Memorandum at 2; *see also* Memorandum for Alice Daniel, Assistant Attorney General, Civil Division, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of the Non-Disclosure Provisions of the Tax Reform Act* (Nov. 7, 1980); Watergate NARA Opinion, 1 Op. O.L.C. at 218–19. We have similarly relied on the rule of relative specificity to bolster our conclusions that Congress would not, absent a clear statement, have overridden the "specific" and "carefully delineated" schemes protecting Rule 6(e), Title III, and census information through general statutes providing broad access to large categories of information held by multiple government agencies. FBI NARA Memorandum at 2; *see Census Confidentiality* at 11–12.

The rule of relative specificity, of course, does not always favor a withholding statute over an access statute. Sometimes we have deemed the rule inapplicable because two competing statutes were comparably specific. In resolving a conflict between Rule 6(e)'s secrecy requirement and the right of access under section 104(a) of the National Security Act, for example, we found the rule inconclusive because both statutes dealt with "narrow and specialized categories of

information"—although we nonetheless found that Rule 6(e) prevailed over section 104(a) because of the clear statement rule protecting highly sensitive information. *Rule 6(e) Intelligence Community*, 21 Op. O.L.C. at 165 n.9; *see also Gulf War Veterans Health Statutes*, 23 Op. O.L.C. 49, 52 (1999) (deeming the canon inconclusive where "the two provisions are at the same order of specificity"). In another circumstance, we concluded that the rule of relative specificity was inconclusive in resolving a conflict between two statutes because each was "more specific" in one respect but "less specific" in another. *Restrictions on Travel by Voice of America Correspondents*, 23 Op. O.L.C. 192, 195 n.2 (1999).

Here, we believe the rule of relative specificity applies, and suggests that the nondisclosure provisions in Title III, Rule 6(e), and section 626 should prevail over the general right of access contained in section 6(a)(1) absent a clear indication of congressional intent to the contrary. Most obviously, the withholding statutes address with greater specificity the type of information they regulate: where section 6(a)(1) directs agencies to disclose "all records" and other materials within an inspector general's investigative jurisdiction, Title III, Rule 6(e), and section 626 address the treatment of narrow and well-defined classes of information. *See* 18 U.S.C. § 2517 ("the contents of any [intercepted] wire, oral, or electronic communication"); Fed. R. Crim. P. 6(e)(2)(B) ("a matter occurring before the grand jury"); 15 U.S.C. § 1681u(a)–(c) ("the names and addresses of all financial institutions . . . at which a consumer maintains or has maintained an account," the consumer's "name, address, former addresses, places of employment, or former places of employment," and "consumer report[s]"). And, as we have explained above, *see supra* Part II, Congress "carefully prescribed" the precise conditions under which disclosure of Title III, Rule 6(e), and section 626 information would be lawful, FBI NARA Memorandum at 2. This precise specification makes it "unrealistic" to think that Congress would have intended to permit disclosure outside of the conditions it prescribed, absent a clear indication of an intent to do so. *Id.*; *see* Watergate NARA Opinion, 1 Op. O.L.C. at 218 ("The amount of attention that was paid to the formulation of the exceptions would allow for an inference that no exception was intended as to the Archives."); *see also Hinck v. United States*, 550 U.S. 501, 506 (2007) ("[I]n most contexts, a precisely drawn, detailed statute pre-empts more general remedies." (internal quotation marks omitted)).

Section 6(a)(1) is arguably as specific as the withholding statutes with respect to the lawful recipients of information: section 6(a)(1) grants access only to particular identified individuals. However, the careful prescriptions of the conditions for disclosure contained in the withholding statutes demonstrates that even in this respect, they are more specific than section 6(a)(1). The withholding statutes specify not only the lawful recipients of Title III, Rule 6(e), and section 626 information, but also the circumstances in which those recipients may obtain information. Title III, for example, authorizes disclosure to investigative or law enforcement officers only "to the extent that such disclosure is appropriate to the proper

performance of the official duties of the officer making or receiving the disclosure," 18 U.S.C. § 2517(1); Rule 6(e) authorizes disclosure to an attorney for the government only "for use in performing that attorney's duty" to enforce federal criminal law, Fed. R. Crim. P. 6(e)(3)(A)(i); and section 626 authorizes the FBI to disclose covered information to other federal agencies only "as may be necessary for the approval or conduct of a foreign counterintelligence investigation," 15 U.S.C. § 1681u(f). By contrast, section 6(a)(1) authorizes disclosure to "the Inspector General," but the IG Act is silent as to how an inspector general may use information he has obtained pursuant to section 6(a)(1), other than to set forth the general duties and responsibilities of the office that implicitly constrain the use of such information. *See, e.g.*, 5 U.S.C. app. § 4; *Burlington N. R.R. Co. v. Office of Inspector Gen., R.R. Retirement Bd.*, 983 F.2d 631, 641 (5th Cir. 1993) ("[A]n Inspector General's investigatory powers generally [do not] extend to matters that do not concern fraud, inefficiency, or waste within a federal agency.").[18]

Accordingly, the rule of relative specificity applies here, and reinforces the other clear statement principle discussed above. Just as that principle requires a clear statement before we may conclude that Congress abrogated the confidentiality of Rule 6(e), Title III, or section 626 information, so the rule of relative specificity requires a clear statement before we may conclude that the general right of access granted by section 6(a)(1) takes precedence over the specific, carefully delineated limits on disclosure Congress set forth in those statutes.[19] It is not surprising that these rules are mutually reinforcing. Ultimately, both stem from the commonsense notion that where Congress has legislated with great care on a particular subject—whether by establishing strict limits on the disclosure of information it considers highly sensitive, or by creating a specific and detailed statutory scheme—it is unlikely to have displaced the limits it imposed through unclear or general language.

---

[18] Even if the IG Act addressed the lawful recipients of information with the same degree of specificity as Title III, Rule 6(e), and section 626, that fact alone would not render the rule of relative specificity inapplicable. We have often applied the rule in comparable circumstances. *See, e.g.*, *National Archives Access to Taxpayer Information*, 21 Op. O.L.C. at 94–95 (concluding that a specific statute regulating the disclosure of tax returns takes precedence over a general statute granting the Archivist of the United States access to the records of any federal agency); *GAO Access*, 12 Op. O.L.C. at 182–83 (concluding that a "specific statute directly addressing one executive branch agency's handling of trade secret information" takes precedence over a "general statute addressed to [the Comptroller General's access to] all kinds of information in possession of the executive branch").

[19] Although the timing of the enactment of conflicting statutes can sometimes be relevant to their interpretation, *see infra* pp. 65–66, that timing does not affect the applicability of the principles discussed in the text to the statutes at issue here. This Office has thought a clear statement was necessary to permit access both to information protected by "long-established polic[ies]" of confidentiality, *Sells*, 463 U.S. at 424; *Census Confidentiality* at 8, and to information protected by statutes enacted "subsequent" to the competing access provision, FBI NARA Memorandum at 2. Likewise, the Supreme Court has held that "a more specific statute will be given precedence over a more general one, regardless of their temporal sequence." *Busic v. United States*, 446 U.S. 398, 406 (1980). The clear statement rules we have discussed above thus apply equally to Rule 6(e) and Title III, which preceded section 6(a)(1), and to section 626, which postdated it.

As a result, the dispositive question in resolving the conflict between section 6(a)(1) and these three withholding statutes is whether Congress clearly expressed an intention in the IG Act to grant inspectors general access to information protected by Rule 6(e), Title III, or section 626 notwithstanding the limits those statutes place on disclosure.

## B.

With these principles in mind, we now consider whether section 6(a)(1) contains the kind of clear statement necessary to override the withholding statutes' limitations on disclosure. OIG contends that Congress intended the IG Act to grant it "full and prompt access to information obtained by [the Department] through the use of" Title III, Rule 6, and section 626. OIG 2014 Memorandum at 9. In particular, OIG argues that section 6(a)(1) grants it "affirmative and explicit authority" to obtain those materials, and that the IG Act's other provisions, structure, and purpose indicate that that right of access is not subject to the limits imposed by those withholding statutes. *Id.*; *see* OIG Supplemental Memorandum at 11–15. OIG's arguments are substantial. We conclude, however, that the IG Act does not provide the kind of clear indication of congressional intent necessary to override the specific, carefully drawn limitations in Title III, Rule 6(e), and section 626.

To begin, the text of the IG Act does not contain the sort of language we have previously found sufficient to constitute a clear statement that Congress intends to override more specific statutory provisions that protect sensitive information. The IG Act does not mention Title III or Rule 6(e), despite having been enacted after these statutes. *Cf. Title III Intelligence Community*, 24 Op. O.L.C. at 272 (noting that "[n]othing in the language of" the general disclosure provision of the National Security Act "refers to Title III information," despite having been added after Title III); *Census Confidentiality* at 6, 8 (noting that section 215 of the Patriot Act "contains no express and specific statement indicating an intention" to override the "well-established confidentiality protections set forth in the Census Act," and "makes no reference to the census or the Census Act"); *Rule 6(e) Intelligence Community*, 21 Op. O.L.C. at 165 ("Neither the text of section 104(a) [of the National Security Act] nor its pertinent legislative history contains . . . an affirmative expression of intent to override grand jury secrecy restrictions."). Nor does the IG Act contain general language addressing potential conflicts with other statutory confidentiality provisions, such as a statement that the inspector general's right of access shall apply "notwithstanding any other law" or "notwithstanding any statutory prohibition on disclosure"—language that might, at least in some circumstances, provide a clearer indication that the general access language was supposed to override more specific statutory protections of confidential

information.[20] *See, e.g.*, *Brady Act Implementation Issues*, 20 Op. O.L.C. 57, 62 (1996) (concluding that a Brady Act provision permitting the Attorney General to obtain relevant information from any department or agency "[n]otwithstanding any other law" permitted access to information otherwise subject to restrictions in the Privacy Act); *Census Confidentiality* at 9 (noting that section 215 of the Patriot Act "contains no language" like "notwithstanding any provision of law" (internal quotation marks omitted)).[21] Thus, while section 6(a) establishes a general right of access by inspectors general, it does not expressly address the relative strength of that right compared to other statutory restrictions on disclosure that would by their terms exclude access by inspectors general—let alone clearly resolve that the general right of access overrides the conflicting statutory provisions.

According to OIG, the IG Act's command that agencies provide inspectors general with unfettered access to information is nonetheless clear. Section 6(a)(1), OIG observes, authorizes each inspector general "to have access to *all* records" available to his agency and within his investigative jurisdiction. OIG 2014 Memorandum at 8 (emphasis added). We recognize that the word "all," read literally, extends to every record available to an agency, whether protected by a withholding statute or not. But the Supreme Court has noted that "circumstances may counteract the effect of expansive modifiers" like "all" or "any," *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 221 n.4 (2008), particularly in circumstances where a clear statement rule applies. In *Raygor v. Regents of University of Minnesota*, 534 U.S. 533 (2002), for example, the Court considered whether a statute granting federal district courts jurisdiction to hear "*all* other claims" that are part of a case or controversy over which a district court has original jurisdiction was sufficiently clear to evince congressional intent to abrogate state sovereign immunity. The Court concluded that, despite the facial breadth of the statute, it did not confer jurisdiction on district courts to hear claims against states that did not consent to be sued. "[E]ven though nothing in the statute expressly exclude[d] such claims," and the grant of jurisdiction was "facially broad" enough to cover them,

---

[20] Even a grant of access that includes a "notwithstanding any other provision of law" clause might not, in all circumstances, overcome a conflicting, detailed statutory scheme restricting the disclosure of information. *Cf. United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) ("In examining specific statutes, we have not . . . always accorded universal effect to the 'notwithstanding' language. Instead, we have determined the reach of each such 'notwithstanding' clause by taking into account the whole of the statutory context in which it appears." (internal citations omitted)).

[21] Statutes containing such language are not unusual. *See, e.g.*, 18 U.S.C. § 922(t) note ("Notwithstanding any other law, the Attorney General may secure directly from any department or agency of the United States such information . . . as is necessary to enable the [NICS] to operate in accordance with this section."); 12 U.S.C. § 5226(a)(2)(C)(i) ("Notwithstanding any other provision of law . . . the Comptroller General shall have access, upon request, to any information, data, schedules, books, accounts, financial records, reports, files, electronic communications, or other papers."); 15 U.S.C. § 78g(f)(2) ("Notwithstanding any other provision of law . . . the Attorney General shall provide the Commission and self-regulatory organizations designated by the Commission with access to all criminal history record information.").

the Court found the statutory language "insufficient to constitute a clear statement of an intent to abrogate state sovereign immunity." *Id.* at 541–42; *see also Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 786 (1991) (concluding that 28 U.S.C. § 1362, which establishes federal jurisdiction over "*all* civil actions" that satisfy the amount in controversy requirement, lacks the "clear legislative statement" necessary to override state sovereign immunity).

Even more directly relevant, this Office has concluded that broad, general terms like "all" and "any" do not provide the clear statement of congressional intent needed to override specific, detailed statutory limitations or prohibitions on the disclosure of sensitive information about which Congress has expressed a special concern for privacy. In our *Rule 6(e) Intelligence Community* opinion, for example, we determined that a statute much like the IG Act, which granted the Director of Central Intelligence "access to *all* intelligence related to national security," did not "clearly manifest an intent to reach grand jury information." 21 Op. O.L.C. at 165 (emphasis added). Although we acknowledged that "the 'intelligence' covered by the statute could reasonably be interpreted to encompass certain kinds of grand jury information," we thought that "[t]he most that may be said about [the statute's] text in this regard is that it is unclear on the point." *Id.* at 165–66. We later concluded that the same statute—despite the word "all"—did not authorize unrestricted disclosure of Title III information to the Director of Central Intelligence. *See Title III Intelligence Community*, 24 Op. O.L.C. at 272–73. And in our *Census Confidentiality* opinion, we concluded that a section of the Patriot Act authorizing the FBI to obtain "*any* tangible things . . . for an investigation to obtain foreign intelligence information" was not sufficiently clear to overcome the presumption of confidentiality for census information. *Census Confidentiality* at 5, 8 (emphasis added); *see also Confidential Treatment of Census Records*, 40 Op. Att'y Gen. at 327–28 (concluding that a statute granting the Archivist of the United States the "authority to make regulations for the arrangement, custody, use, and withdrawal of material" requisitioned for deposit in the National Archives building, and repealing "*[a]ll* Acts or parts*" inconsistent with this authority, did not contain the "very clear language" necessary to abrogate the statutory provisions governing confidential treatment of census records (emphasis added)). Thus, the word "all," on its own, does not provide the clear statement necessary to reach Title III, Rule 6(e), and section 626 information.

OIG further argues that Congress's intent to grant it access to statutorily protected information under section 6(a)(1) is made apparent by a negative implication from sections 6(a)(3) and 6(b)(1) of the IG Act. Whereas section 6(a)(1) grants inspectors general access to materials *within* the agencies they help oversee, section 6(a)(3) of the Act authorizes them to "request . . . information or assistance . . . from *any* Federal, State, or local governmental agency or unit thereof." 5 U.S.C. app. § 6(a)(3) (emphasis added). Section 6(b)(1) qualifies this latter authorization by providing:

> Upon request of an Inspector General for information or assistance under subsection (a)(3), the head of any Federal agency involved shall, insofar as is practicable and *not in contravention of any existing statutory restriction* or regulation of the Federal agency from which the information is requested, furnish to such Inspector General, or to an authorized designee, such information or assistance.

*Id.* § 6(b)(1) (emphasis added). Section 6(b)(1) thus makes explicit that the obligation of another agency to respond to an inspector general's request for information under section 6(a)(3) is subject to, among other things, "existing statutory restriction[s]." But neither section 6(b)(1) nor any other provision in section 6 imposes a similarly express limitation on the right of access under section 6(a)(1). OIG argues that this omission was intentional, and coupled with the inclusion of the express limitation in section 6(b)(1), implies that Congress intended access under section 6(a)(1) to be "automatic" and free of any "existing statutory restriction[s]." OIG Supplemental Memorandum at 12–13.

OIG's argument is "admittedly a plausible one," *Sells*, 463 U.S. at 435, and in a different interpretive context, it might prevail. But as we have discussed, before concluding that a general access provision abrogates detailed, specific statutory provisions that restrict disclosure of sensitive information, both this Office and the courts have required a clear and express statement to that effect. And despite its plausibility, the inference OIG would draw from section 6(b)(1) is simply that: an inference. It is not a clear statement that plainly and unambiguously indicates that Congress intended the general access provision in section 6(a)(1) to trump more specific provisions that protect highly sensitive information. *See, e.g.*, *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 41 (2006) (stating that a "negative inference" from the absence of express language, found elsewhere in the same statute, that a particular provision was intended to apply only prospectively would not constitute a "clear statement" of intent to apply the provision retroactively).

Moreover, even if a negative inference could, in some circumstances, be unequivocal enough to establish a clear manifestation of congressional intent, the inference OIG invokes would not in our view satisfy that high standard. For one thing, the inference "'that the presence of a phrase in one provision and its absence in another reveals Congress's design . . . grows weaker with each difference in the formulation of the provisions under inspection.'" *Clay v. United States*, 537 U.S. 522, 532 (2003) (quoting *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435–36 (2002)). And here, section 6(b)(1) differs from section 6(a)(1) in at least two significant ways. First, section 6(b)(1) is structured as an adjunct to a separate provision, section 6(a)(3), that allows an inspector general to "request" particular items from an agency other than his own. Because section 6(a)(3) establishes only an inspector general's right to *request* materials from outside his agency, Congress required an additional provision, section 6(b)(1), to specify the scope of other agencies' obligations to "furnish" the requested material to an

inspector general. Section 6(a)(1), in contrast, is not part of a similar bifurcated structure, but rather—by giving an inspector general a right of "access" to certain materials—establishes both an inspector general's right to receive and, by implication, the agency's obligation to provide relevant material. Thus, unlike in the case of section 6(a)(3), Congress had no need to say anything in subsection (b)(1) about the scope of an agency's obligation to comply with an inspector general's attempt to obtain materials under section 6(a)(1). *See Ours Garage*, 536 U.S. at 434 (concluding that, because of significant differences in the formulation of certain related statutory provisions, any negative inference arising from the inclusion in one provision of a phrase omitted from the other was insufficient to constitute a "clear and manifest indication" of congressional intent).

Second, as the text of section 6(b)(1) makes clear, Congress chose to impose several limitations on an inspector general's right to obtain information from outside his agency, including that outside agencies need only provide the requested information "insofar as is practicable" and to the extent permitted by "existing . . . regulation[s]." 5 U.S.C. app. § 6(b)(1). Those limitations, because they do not themselves have a statutory basis, would not obviously have applied unless Congress imposed them expressly. But having done so, Congress may have felt compelled to add "existing statutory restriction[s]" to the list of limitations in order to dispel any inference that it did not intend those restrictions to apply as well. In contrast, Congress chose not to make an inspector general's right of access under section 6(a)(1) subject to any similar restrictions with a non-statutory source. It therefore had no similar need to expressly refer to "existing statutory restriction[s]" when drafting that provision. *See Gomez-Perez v. Potter*, 553 U.S. 474, 486–88 (2008) (declining to draw a negative inference from the omission of an express prohibition on retaliation in one section of the Age Discrimination in Employment Act and its inclusion in another, where the second section set out "a specific list of forbidden employer practices," and the inclusion of retaliation among them may have been necessary to "dispel any . . . inference" that "Congress did not want to reach retaliation").

OIG's inference is further clouded by the text of section 6(b)(2) of the IG Act, which provides that an inspector general shall report to Congress if "information or assistance requested under subsection (a)(1) or (a)(3) is, in the judgment of [the] Inspector General, *unreasonably* refused or not provided." 5 U.S.C. app. § 6(b)(2) (emphasis added). This subsection suggests that it is possible to "reasonably" refuse to grant an inspector general access to materials under subsection (a)(1). And if access can "reasonably" be refused under subsection (a)(1), then that provision cannot provide the unfettered and absolute right to information asserted by OIG. To be sure, it is also possible to read subsection (b)(2) to mean that *any* information refused under subsection (a)(1) is necessarily refused "unreasonably," given the broad right of access provided by that subsection. But subsection (b)(2) is not clear on this point, and it can be read to suggest that subsection (a)(1) has an implicit

exception, consistent with the principles of statutory interpretation discussed above, for specific statutory schemes protecting highly sensitive information.

Read together, then, we do not believe the various provisions of section 6 contain the kind of clear statement necessary to overcome the carefully drawn limitations on disclosure of highly sensitive information found in Title III, Rule 6(e), and section 626. And to the extent that those provisions create any ambiguity, the IG Act's legislative history affirmatively suggests that Congress intended to subject inspector general access under section 6(a)(1) to applicable statutory restrictions. In particular, the Senate Report accompanying the IG Act flatly states that section 6(a) is "a broad mandate permitting the Inspector . . . General the access he needs to do an effective job *subject, of course, to the provisions of other statutes, such as the Privacy Act.*" S. Rep. No. 95-1071, at 33–34 (1978) (emphasis added). In addition, a version of the bill initially passed by the House of Representatives would have expressly granted inspectors general access to records notwithstanding certain limitations of the Privacy Act (a clarification that would, incidentally, have been superfluous had the House believed that section 6(a)(1) already exempted inspectors general from all statutory limits on disclosure). *See* H.R. 8588, 95th Cong., § 5(b)(3) (as passed by the House of Representatives, April 18, 1978).[22] The Senate removed that provision from the final version of the bill because, the Senate Committee Report explained, the House's language would have granted inspectors general "a power that no other official of the executive branch has—the authority to require the transfer of personal information from any agency . . . without regard for the protections of the Privacy Act." S. Rep. No. 95-1071, at 13. Removing the provision, the Report stated, "does not mean that an Inspector . . . General will be unable to obtain needed information to perform his responsibilities. It simply means that the information must be obtained *in conformity with the exemptions and procedures of the [Privacy Act].*" *Id.* (emphasis added). The Report explained that this would not be difficult, because "all information within the agency would be available to the Inspector . . . General, *based on the 'intra-agency' exemption"* included in the Privacy Act itself. *Id.* (emphasis added). This language strongly suggests that, at least in the Committee's view, inspectors general would remain subject to other statutory requirements, including statutory restrictions on use and disclosure, when seeking access under section 6(a)(1), and further undermines the

---

[22] This draft provided: "In the event any record or other information requested by the Inspector General under subsection (a)(1) or (a)(3) is not considered to be available under the provisions of section 552a(b) (1), (3), or (7) of title 5, United States Code, such record or information shall be available to the Inspector General in the same manner and to the same extent it would be available to the Comptroller General." H.R. 8588, § 5(b)(3). The "subsection[s] (a)(1) [and] (a)(3)" referred to in this provision of the House bill are identical to those currently found at subsections 6(a)(1) and (a)(3) of the IG Act as enacted. *Compare id.* § 5(a)(1), (3) *with* 5 U.S.C. app. § 6(a)(1), (3). Title 5, section 552a is the Privacy Act, which (then as now) expressly exempted the Comptroller General from the Privacy Act's general prohibition on the disclosure of covered information. *See* 5 U.S.C. § 552a(b)(10).

notion that Congress intended to grant access to Rule 6(e), Title III, and section 626 information without regard to the limitations set forth in those statutes.[23]

OIG also invokes a later-enacted IG Act provision specific to the Department—current section 8E—to support its reading of section 6(a)(1). As we have noted, this section, among other things, authorizes the Attorney General to withhold records from OIG, or otherwise direct and supervise an OIG investigation, if she determines that doing so would be "necessary to prevent the disclosure of" certain sensitive information—such as "sensitive information concerning . . . ongoing civil or criminal investigations" or "the identity of confidential sources"—"or to prevent the significant impairment to the national interests of the United States." 5 U.S.C. app. § 8E(a)(1), (2). It further provides that if the Attorney General exercises such authority, she must "notify the Inspector General in writing stating the reasons for such exercise," and that OIG must transmit a copy of that notice to appropriate committees in Congress. *Id.* § 8E(a)(3). OIG argues that the "exacting procedures" imposed by this provision, as well as its historically "infrequent use," confirm that section 8E represents an "extraordinary departure from the baseline rule, established by section 6, that the Inspectors General enjoy access to documents and materials," and demonstrates that only in the specific circumstances set out in section 8E may the Attorney General withhold requested records. OIG Supplemental Memorandum at 18; *see* OIG 2014 Memorandum at 8–9.

We disagree. For one thing, section 6(a)(1) was enacted in 1978 as part of the original IG Act, while section 8E, like the special provisions applicable to other departments and agencies, was added to the statute years later.[24] The negative inference that OIG seeks to draw from the inclusion of certain heightened procedures in section 8E is therefore attenuated. *See Gomez-Perez*, 553 U.S. at 486 ("'[N]egative

---

[23] OIG responds to this argument by contending that "the phrase 'subject . . . to'" in the Senate Report "does not necessarily mean that [an inspector general's] right of access to documents and materials is restricted by general statutory or regulatory limitations on the disclosure of those materials; it is just as plausible to read 'subject . . . to' to mean that, when using the materials they access, the IGs are not exempt from any statutory and regulatory limitations on disclosure." OIG Supplemental Memorandum at 15. But the quoted passage from the Senate Report is not addressed to an inspector general's *use* of information; rather, it specifically addresses *access* to information, and is contained in a section of the Senate Report discussing the right of access provided by section 6(a). *See* S. Rep. No. 95-1071, at 33–34. Moreover, the Report separately makes the same point when discussing limitations on disclosure. *See id.* at 32 ("[T]he Inspector . . . General must adhere to statutes such as 26 U.S.C. § 6013 [sic], dealing with tax returns, or Federal Rule of Criminal Procedure 6(e), dealing with grand jury information, which prohibit disclosure even to Congress."). In addition, OIG's argument does not address the Report's multi-page discussion of the Privacy Act exception and the effect of its omission from the bill that ultimately became the IG Act.

[24] In addition to section 8E, which applies to the Department, sections 8 through 8I of the IG Act contain special provisions relating to the Department of Defense (section 8), the Agency for International Development (section 8A), the Nuclear Regulatory Commission (section 8B), the Federal Deposit Insurance Corporation (section 8C), the Department of the Treasury (section 8D), the Corporation for National and Community Service (section 8F), certain federal entities (section 8G), Inspectors General of the Intelligence Community (section 8H), and the Department of Homeland Security (section 8I). *See* 5 U.S.C. app. §§ 8–8I.

implications raised by disparate provisions are strongest' in those instances in which the relevant statutory provisions were 'considered simultaneously when the language raising the implication was inserted.'" (alteration in original) (quoting *Lindh v. Murphy*, 521 U.S. 320, 330 (1997))). In any event, that inference is unconvincing on its own terms. Section 8E does not authorize the Attorney General to withhold only those records protected from disclosure by statute. Indeed, many of the records that the Attorney General may withhold under that section are not entitled to protection under any statute. For example, "information concerning . . . ongoing civil or criminal investigations" or "the identity of confidential sources," 5 U.S.C. app. § 8E(a)(1)(A), (C), would be protected by Rule 6(e) only if the investigation were criminal and had reached the grand jury stage. Conversely, much information that is protected by statute may not be subject to withholding under section 8E, such as Title III information that is not pertinent to an ongoing civil or criminal investigation or any other sensitive matter described in that section. Section 8E thus does not merely duplicate the protections afforded by Title III, Rule 6(e), or section 626; it grants the Attorney General authority over disclosures that is in some respects broader, and in some respects narrower, than the requirements of those provisions, and thus serves a distinct purpose.

Finally, in addition to these arguments based on the Act's text and structure, OIG appeals to the general purposes of the IG Act. This statute was intended, OIG explains, to grant inspectors general a broad right of access to agency materials, including records containing sensitive information, so that they could conduct meaningful reviews of programs within their jurisdiction. *See* OIG Supplemental Memorandum at 12, 14–15. OIG points out, for instance, that the Act's Senate Report characterizes section 6(a) as a "broad mandate" and describes such access as "obviously crucial." *Id.* at 16 (quoting S. Rep. No. 95-1071, at 33–34); *see also, e.g.*, H.R. Rep. No. 95-584, at 14 (1977) (stating that the access provision "makes clear that each Inspector General is to have access to all records, documents, et cetera, available to his or her agency which relate to programs and operations with respect to which the office has responsibilities"). OIG argues that this goal would be undermined by a construction of the statute that prohibited it from obtaining materials protected by Title III, Rule 6(e), and section 626.

We agree that Congress intended to grant each inspector general a broad right of access, and we do not doubt that such a right of access is crucial to enabling OIG to fulfill its statutory mission. But this kind of general congressional intent does not resolve the specific question at issue here: whether Congress clearly expressed an intention that the inspector general's "broad mandate" in section 6(a)(1) supersede the limits on disclosure contained in Title III, Rule 6(e), and section 626. As we have noted, the IG Act's text contains no such expression of intent, and the Act's legislative history affirmatively indicates that Congress did *not* intend to grant that kind of unlimited access to inspectors general. Moreover, in the same Report in which the Senate Committee described the "broad mandate" found in section 6(a)(1)—indeed, in the same sentence—it also stated that an inspector general's access would be

"subject, of course, to the provisions of other statutes, such as the Privacy Act." S. Rep. No. 95-1071, at 33–34; *see also id.* at 13–14.[25] It thus appears Congress did not believe (let alone clearly indicate) that the broad right of access it was giving each inspector general was inconsistent with requiring compliance with specific statutory regimes that protect highly sensitive information.

In sum, neither the text of the IG Act, nor its legislative history, nor its general purpose offers a clear indication that Congress intended to override the separate statutory confidentiality requirements applicable to Title III, Rule 6(e), and section 626 information. As a result, under both the principle requiring that a statute contain a clear statement in order to abrogate protections of highly sensitive information, and the rule of relative specificity, OIG remains subject to the limitations imposed by Title III, Rule 6(e), and section 626. The Department therefore may not disclose information covered by those statutes except in accordance with their provisions.[26]

## IV.

We have also considered whether a recent appropriations rider grants OIG access to information it could otherwise not obtain under Title III, Rule 6(e), or section 626. Section 218 of the Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2200 (Dec. 16, 2014), provides:

> No funds provided in this Act shall be used to deny the Inspector General of the Department of Justice timely access to all records, documents, and other materials in the custody or possession of the Department or to prevent or impede the Inspector General's access to such records, documents and other materials, unless in accordance with an express limitation of section 6(a) of the Inspector General Act,

---

[25] The full passage reads:

> Access to all relevant documents available to the applicable [agency] relating to programs and operations for which the Inspector and Auditor General has responsibilities is obviously crucial. The committee intends this subsection to be a broad mandate permitting the Inspector and Auditor General the access he needs to do an effective job, subject, of course, to the provisions of other statutes, such as the Privacy Act.

S. Rep. No. 95-1071, at 33–34.

[26] We express no view about whether inspectors general have a right to obtain information protected from disclosure by provisions other than Title III, Rule 6(e), and section 626. Resolution of that issue would depend on whether those other statutes protected highly sensitive information about which Congress has "expressed a strong congressional intent to maintain very strict privacy," FBI NARA Memorandum at 1–2, whether those statutes regulated the treatment of covered information with greater specificity than the IG Act, and whether the IG Act or some other relevant statute contained a clear statement authorizing disclosure of the information to inspectors general.

as amended, consistent with the plain language of the Inspector General Act, as amended. The Inspector General of the Department of Justice shall report to the Committees on Appropriations within five calendar days any failures to comply with this requirement.

This rider permits the Department to expend Fiscal Year 2015 funds to withhold records from OIG only where doing so would be "in accordance with an express limitation of section 6(a) of" the IG Act, "consistent with the plain language of" that Act. It also imposes two other legal requirements for the remainder of Fiscal Year 2015 that are not already expressly set forth in the IG Act. First, it bars the Department from using appropriated funds to deny—and so effectively obligates the Department to grant—OIG access to records in a "timely" manner, a matter on which the text of the IG Act is silent. And, second, it imposes on OIG an obligation to report failures to comply with these requirements to the congressional appropriations committees within five calendar days. Obligation or expenditure of funds contrary to the terms of the rider would violate the Anti-Deficiency Act, 31 U.S.C. §§ 1341 *et seq.*, a statute that subjects federal officials obligating or expending funds in advance or in excess of appropriations to administrative penalties, and to criminal penalties in the case of knowing and willful violations, *id.* §§ 1341(a), 1349(a), 1350.

OIG contends that, for two independent reasons, section 218 affirms its right to obtain Title III, Rule 6(e), and section 626 information notwithstanding the disclosure limitations in those statutes. First, according to OIG, section 218 reflects a congressional understanding that section 6(a)(1) of the IG Act requires the Department to disclose all relevant materials to OIG. "The passage of [section 218]," OIG argues, "serves as a reaffirmation of clear congressional intent, originally manifested in section 6(a) . . . that the OIG is entitled to access to 'all records, reports, audits, reviews, documents, papers, recommendations, or other material available to' the Department." OIG 2015 E-mail; *see* OIG 2014 Memorandum at 4. Second, regardless of the correct interpretation of section 6(a)(1), OIG argues that section 218 independently and "unequivocal[ly]" requires the Department to disclose to OIG all information it requests, unless the Department withholds that information pursuant to a provision, such as section 8E, that expressly limits the right of access granted by the IG Act. OIG 2015 E-mail; *see The Department of Justice Office of the Inspector General's Fiscal Year 2016 Budget Request: Hearing Before the Subcomm. on Commerce, Justice, Science and Related Agencies of the H. Comm. on Appropriations*, 114th Cong. 9–10 (2015) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). Because neither Title III nor Rule 6(e) nor section 626 expressly addresses disclosures under the IG Act, the rider (in OIG's view) prohibits the Department from expending Fiscal Year 2015 appropriated funds to withhold Title III, Rule 6(e), or section 626 materials from OIG. *See* OIG 2015 E-mail.

Although OIG's arguments are again substantial, we ultimately disagree that section 218 grants OIG access to information otherwise protected by Title III,

Rule 6(e), and section 626. With respect to OIG's first argument, we have already concluded, for the reasons set forth in Part III above, that the IG Act lacks the clear statement of congressional intent necessary to override the detailed and specific statutory disclosure prohibitions set forth in Title III, Rule 6(e), and section 626. In order to alter this conclusion about the IG Act's meaning, section 218 would need to contain a clear statement indicating that section 6(a)(1) should be interpreted to override those statutory limitations on disclosure. But it is not clear that section 218 contains *any* instruction about how the IG Act should be interpreted: it does not expressly declare the Act's meaning, amend the Act to clarify its terms, or depend for its effectiveness on a particular interpretation of the IG Act. *See Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (concluding that a later-enacted law that lacks these features, or any other "forward looking legislative mandate, guidance, or direct suggestion about how [to] interpret [an] earlier provision[]," is "beside the point" in interpreting that provision). It is possible that Congress intended—by providing that the Department may not expend Fiscal Year 2015 funds to withhold information from OIG "unless in accordance with an express limitation of section 6(a) of the [IG Act], consistent with the plain language of the [Act]"—to convey its understanding of what the "plain language" of the IG Act means. But this inference, itself far from clear, would merely raise the question of what qualifies as "an express limitation of section 6(a)," a phrase that is in turn subject to various interpretations. *See infra* pp. 63–65. Given these multiple layers of uncertainty, section 218 does not provide a clear statement that the IG Act should be interpreted to override the limitations on disclosure contained in Title III, Rule 6(e), and section 626.

We also disagree that, considered on its own, the rider contains a clear statement of Congress's intent to override those limitations on disclosure. As noted above, section 218 permits Department officials to deny materials to OIG "in accordance with an express limitation of section 6(a) of the Inspector General Act, as amended, consistent with the plain language of the [Act], as amended." In our view, there are at least three conceivable constructions of the phrase "express limitation of section 6(a) of the Inspector General Act." First, it could be interpreted to encompass only those limitations on disclosure that either appear in section 6(a) itself or that expressly refer to that section. Second, it could be interpreted to encompass only those limitations on disclosure that are specifically directed at disclosures to OIG under the IG Act, whether or not they explicitly refer to section 6(a). Third, it could be interpreted to encompass all "express" limitations on disclosure that, when considered in conjunction with section 6(a), are properly deemed to function as "limitation[s] of section 6(a)." For the reasons discussed below, we believe that the first interpretation is not plausible, but that the second and third interpretations are. And because the third interpretation would allow the Department to continue to withhold materials from OIG to the extent required under the terms of Title III, Rule 6(e), and section 626, section 218 does not in our view

constitute the sort of clear statement of congressional intent necessary to override those nondisclosure provisions.

Under the first potential interpretation of the rider, Department officials would be prohibited from denying OIG access to documents and other materials except pursuant to a "limitation of section 6(a)" that "express[ly]" referred to (or was contained in) section 6(a) itself. This is a natural reading of section 218's text. However, if this reading were correct, section 218 would prohibit Department officials from withholding records from OIG not only under Title III, Rule 6(e), and section 626, but also under section 8E of the IG Act: while section 8E plainly authorizes the withholding of certain records otherwise accessible under section 6(a), it does not refer explicitly to section 6(a). Section 218 does not expressly state that it was intended to partially repeal section 8E of the IG Act, and in our view, it is implausible to construe it as having done so implicitly. *See infra* pp. 65–66 (discussing strong presumption against implied repeals in appropriations acts). Moreover, such a reading would be inconsistent, rather than "consistent," with the "plain language of" other parts of the IG Act, and thus would fail to make sense of section 218 as a whole. *See, e.g.*, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." (internal citations and quotation marks omitted)). It is thus unsurprising that OIG does not advance this reading. *See* OIG 2015 E-mail (stating that section 8E is an "express limitation" within the meaning of section 218).

Under the second potential interpretation, an "express limitation of section 6(a)" would be one that expressly referred to disclosures to OIG, although not specifically to section 6(a). On this reading, Department officials could withhold information under section 8E, which expressly addresses disclosures to OIG. *See* 5 U.S.C. app. § 8E. But they would be foreclosed from withholding information from OIG pursuant to Title III, Rule 6(e), and section 626, because these provisions contain no express reference to OIG. This is not the most natural reading of section 218's text: the phrase "in accordance with an express limitation of section 6(a) of the [IG Act]" is not easily read to mean "in accordance with a limitation that expressly addresses disclosures to OIG under the IG Act." Nonetheless, given that section 6(a) is the principal provision in the IG Act that governs disclosures to OIG, we believe this reading is permissible. Further, while the Explanatory Statement and Senate Report accompanying section 218 do not specifically endorse this interpretation, it arguably gains plausibility from the fact that, as OIG observes, the Department's Inspector General testified before the relevant Senate appropriations subcommittee several months before the rider was enacted, objecting to the Department's failure to grant OIG direct access to materials protected by Title III, Rule 6(e), and section 626. *See The Department of Justice's Fiscal Year 2015 Budget Request: Hearing Before the Subcomm. on Commerce, Justice, Science and Related Agencies of the S. Comm. on Appropriations*, 113th Cong. 7–8 (Apr. 3, 2014) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). *But see Regan v. Wald*,

468 U.S. 222, 237 (1984) (expressing "grave doubts" about the interpretive value of "[o]ral testimony of witnesses and individual Congressmen, unless very precisely directed to the intended meaning of particular words in a statute").

Under the third potential interpretation of the rider, an "express limitation of section 6(a)" would include any explicit statutory nondisclosure provision that, properly construed, operated to prevent disclosure of material that OIG could otherwise obtain under section 6(a). This reading of section 218 would permit withholding not only pursuant to section 8E, but also pursuant to Title III, Rule 6(e), and section 626. The reading is reasonably grounded in statutory text. Statutes like Title III, Rule 6(e), and section 626 can be considered "limitations of section 6(a)" in that they supersede section 6(a) in situations where both section 6(a) and one of those statutes would apply. *See supra* Part III.B. They can be considered "express" limitations, in that they explicitly contemplate, in statutory text, nondisclosure in the circumstances they address. And for the reasons we have explained above, reading these statutory provisions to limit disclosures under section 6(a)(1) is "consistent with the plain language of" the IG Act, as construed using standard tools of statutory interpretation. *See supra* Part III.B.

In our view, although both the second and third interpretations of section 218 are plausible, the third is more appropriate in light of the relevant principles of statutory interpretation. As discussed in Part III above, in order to override the specific withholding provisions in Title III, Rule 6(e), and section 626, section 218 would need to contain a clear congressional statement that it was intended to have that effect. OIG appears to contend that the phrase "unless in accordance with an express limitation of section 6(a) of the [IG Act], consistent with the plain language of the [Act]," clearly means that all materials must be disclosed to OIG absent express language establishing that the materials need not be turned over. But as we have discussed, this interpretation requires reading unstated limitations into the rider's text, since (as OIG concedes) section 218's reference to an "express limitation of section 6(a)" encompasses section 8E, a limitation that does *not* expressly refer to section 6(a). Moreover, as was also noted above, this phrase may plausibly be read to permit Department officials to withhold Title III, Rule 6(e), and section 626 information if OIG does not qualify to receive it under one of those statutes' exemptions. Because the phrase is susceptible to alternative interpretations, one of which would permit withholding under Title III, Rule 6(e), and section 626, it does not constitute a sufficiently clear statement to override the limitations on disclosure imposed by those statutes. *See supra* Part III.

Furthermore, it is significant that section 218 appears in an appropriations act that post-dates the provisions in Title III, Rule 6(e), and section 626 of FCRA. The Supreme Court has long held that a later statute will not be read to repeal an earlier one, even in part, unless Congress's intent to repeal the earlier statute with the later one is "clear and manifest." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662–63 (2007) (internal quotation marks omitted); *see Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978) (refusing to read an appropriations act as

overriding the Endangered Species Act "insofar as it applies to the Tellico Project" absent "'clear and manifest'" evidence); *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 501, 504 (1936) (declining to read a statute as overriding the Federal Reserve Act of 1913 "in so far as the Philippine Islands are concerned" unless such a reading was a "necessary" implication). This principle applies "with even *greater* force when the claimed repeal rests solely on an Appropriations Act," because "legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden," and because Congress's own rules "expressly prohibit[]" substantive changes to existing law in appropriations bills. *Hill*, 437 U.S. at 190–91 (emphasis in original); *see* Rules of the House of Representatives, 114th Cong., R. XXI(2)(b) (2011) ("A provision changing existing law may not be reported in a general appropriation bill . . . ."). Accordingly, there is a "very strong presumption" that appropriations measures do not "amend substantive law," a presumption that may be overcome only by "unambiguous[]" evidence to the contrary. *Calloway v. Dist. of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000).

We do not believe this presumption is overcome with respect to section 218. The rider's text does not mention Title III, Rule 6(e), or section 626, nor does it state that the provision is intended to amend existing statutes in any way. *Cf. Am. Fed'n of Gov't Emp., AFL-CIO v. Campbell*, 659 F.2d 157, 161 (D.C. Cir. 1980) (finding implied repeal where an appropriations act made an "express reference to the earlier statute"). As far as we are aware, the only statements in the legislative history concerning the rider explain that it "is designed to improve OIG access to Department documents and information," 160 Cong. Rec. H9345 (daily ed. Dec. 11, 2014) (explanatory statement submitted by Rep. Rogers), and that it "requires the Department to provide documents to the Inspector General that are necessary as part of audits and investigations," S. Rep. No. 113-181, at 103 (2014). But both these goals would be advanced by all the readings we have discussed, including the reading under which section 218 does not implicitly repeal Title III, Rule 6(e), and section 626. *Cf. Nat'l Treasury Emps. Union v. Devine*, 733 F.2d 114, 120 (D.C. Cir. 1984) (finding implied repeal of personnel regulations where "Congress expressly stated [in the legislative history] that it wished to prevent the effectuation" of the policies set forth in those regulations). Although interpreting section 218 to permit the Department to withhold materials under the provisions of Title III, Rule 6(e), and section 626 would not expand the scope of records available to OIG, it would help ensure that the Department complied with the terms of the IG Act by requiring it to grant OIG access in a "timely" manner; by obligating OIG to promptly report incidents of noncompliance to the appropriations committees; and by adding the possibility of Anti-Deficiency Act consequences for failure to comply. On this interpretation, the purpose of section 218 would be to reaffirm and reinforce the existing disclosure requirements in the IG Act.

We acknowledge that OIG's broader reading of the rider is also plausible, and consonant with events surrounding its enactment. But the presumption against

implied repeals requires not just that a reading constituting an implied repeal be more natural, or that it draw support from comments in the legislative record, but that it be "unambiguous[]," *Calloway*, 216 F.3d at 9; "clear and manifest," *Nat'l Ass'n of Home Builders*, 551 U.S. at 662 (internal quotation marks omitted); or "necessary," *Posadas*, 296 U.S. at 504. As we have explained, because section 218 can also reasonably be read to permit the Department to continue to abide by the "express limitations" on disclosure in Title III, Rule 6(e), and section 626, OIG's interpretation is not compelled by the text; hence, the rider does not offer "unambiguous" evidence that Congress intended to partially repeal existing statutory prohibitions on disclosure. *Calloway*, 216 F.3d at 9. In light of the "very strong" presumption against implied repeals in appropriations acts, *id.*, and the other interpretive principles we have identified, we believe section 218 is best read to permit adherence to the disclosure restrictions in Title III, Rule 6(e), and section 626.

## V.

For the foregoing reasons, we conclude that Title III, Rule 6(e), and section 626 permit the Department to disclose certain statutorily protected information to OIG in certain circumstances. We further conclude that to the extent those statutes prohibit disclosure of such information, neither the IG Act nor section 218 permits the Department to disclose it.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*